**PLANNED PARENTHOOD OF CENTRAL TEXAS; Planned Parenthood of Houston and Southeast Texas; Planned Parenthood of North Texas; Planned Parenthood of San Antonio and South Central Texas; Planned Parenthood of West Texas; and Planned Parenthood of the Texas Capital Region, Plaintiffs,**

v.

**Eduardo J. SANCHEZ, Texas Commissioner of Health, Defendant.**

No. 03–CV–415.

United States District Court, W.D. Texas, Austin Division.

Aug. 4, 2003.

Peter D. Kennedy, George, R. James George, Jr., Donaldson & Ford, Austin, TX, Roger K. Evans, New York, NY, Helene T. Krasnoff, Washington, DC, for plaintiffs.

Lara Grant, Assistant Attorney General, for defendant.

Todd J. Knop, Mike Thompson, Jr., Wright & Greenhill, P.C., Austin, TX, Kelly Shackelford, Hiram S. Sasser, III, Plano, TX, for amicus.

## ORDER

SPARKS, District Judge.

BE IT REMEMBERED on the 25th day of July 2003 the Court called the above-styled cause for hearing on Plaintiffs' Application for Preliminary Injunction, and the parties appeared through counsel of record. Before the Court are Plaintiffs' Complaint [# 1], Application for Temporary Restraining Order and Preliminary Injunction [# 7], Supplemental Mem-

orandum [# 26] and letter brief [# 30] in support thereof, and Supplemental Declarations in Support Thereof [# 21]; Defendant's response to Plaintiffs' Application [# 13] and supplemental brief in support thereof [# 24]; and the Brief of Amicus Curiae Liberty Legal Institute [# 25]. Having considered the above documents, the evidence and arguments presented at the hearing, the case file as a whole and the applicable law, the Court enters the following opinion and order.

### Factual and Procedural Background

This case concerns Rider 8 to the Texas General Appropriations Act (House Bill 1), passed by the Texas legislature on June 2, 2003 and signed into law by Governor Rick Perry on June 22, 2003. *See* Plaintiffs' Ex. 1. Rider 8 affects funding appropriated to the Texas Department of Health ("TDH") for family planning services during the period from September 1, 2003 to August 31, 2005. The state received these funds from the federal government pursuant to three federal laws: the Title X family planning program, 42 U.S.C. § 300 *et seq.;* the Title XX social services block grant program, 42 U.S.C. § 1397 *et seq.;* and the Title XIX Medicaid program, 42 U.S.C. § 1396 *et seq.* The state provides some matching funds required under Title XIX.

Rider 8 states as follows:

8. Prohibition on Abortions.

a. It is the intent of the Legislature that no funds shall be used to pay the direct or indirect costs (including overhead, rent, phones and utilities) of abortion procedures provided by contractors of the department.

b. It is also the intent of the legislature that no funds appropriated under Strategy D.1.2., Family Planning,

shall be distributed to individuals or entities that perform elective abortion procedures or that contract with or provide funds to individuals or entities for the performance of elective abortion procedures.

c. If the department concludes that compliance with b. would result in a significant reduction of family planning services in any public health region of the state, the department may waive b. for the affected region to the extent necessary to avoid a significant reduction in family planning services to the region. This waiver provision shall expire on August 31, 2004, and no waiver shall extend beyond that date.

d. The department shall include in its financial audit a review of the use of appropriated funds to ensure compliance with this section.

*See* Plaintiffs' Ex. 1.

The legislative history of Rider 8 includes hearings before the Conference Committee. *See* Plaintiffs' Ex. 2B. One committee member stated, "the purpose of the rider is to insure that appropriated funds are not used to subsidize abortions." *Id.* at 3. Senator Judith Zaffirini confirmed in her comments on Rider 8 she is "pro-life" but believed "this rider is too far reaching." *Id.* at 4. She stated, "I do believe that the target of this is Planned Parenthood."[1] *Id.* The committee chairman stated: "It would appear to me that it's a fairly simple solution that, if a contractor wished to continue to provide the services, they simply not do abortions and they'll have access to contract with the Department of Health. It'd be pure and

---

1. At the hearing on Plaintiffs' Application for Temporary Restraining Order, the TDH admitted to the Court the Planned Parenthood entities are the only funding recipients affect-

ed by Rider 8. The Defendant later represented to the Court Rider 8 also affects two other entities, although Planned Parenthood is the most significantly affected entity by far.

simple." *Id.* at 7. Representative Sylvester Turner commented, "The question is whether or not the rider goes even further and reduces the services, the needed services to women in addition to what we are doing by virtue of cutting back." *Id.* at 8. The committee ultimately passed the rider by a 6 to 4 vote. *Id.* at 11.

The Plaintiffs filed this lawsuit challenging the constitutionality of Rider 8 on June 26, 2003. The Plaintiffs are nonprofit corporations that provide family planning services using federal funds they receive from the state and also provide abortion services using private funding. The Plaintiffs were approved for family planning funding by the TDH, subject to change from legislation or appropriations, in March 2003, prior to Rider 8's passage. *See* Defendant's Ex. A–1.

Planned Parenthood of Central Texas, headquartered in Waco, provides family planning and abortion services to women in seven counties. *See* Plaintiffs' Ex. 3. The TDH renewed its contract to receive approximately $600,000 in funds for the fiscal year 2004, and it expects it would also receive about $60,000 in Medicaid reimbursements during that period. *Id.* In 2001, Planned Parenthood of Central Texas performed 1,098 abortions, financed entirely by private funds. *Id.*

Planned Parenthood of Houston and Southeast Texas, headquartered in Houston, serves 35 Texas counties in ten clinics. *See* Plaintiffs' Ex. 4. It received a letter from the TDH in March 2003 awarding it over $2.8 million to serve almost 20,000 clients in the fiscal year 2004 and estimates it would also be reimbursed for $550,000 in services to over 3,000 Medicaid recipients during that time. *Id.* In the fiscal year ending August 31, 2002, it performed almost 7,000 abortions using private funds. *Id.*

Planned Parenthood of North Texas is headquartered in Dallas and serves over 70,000 patients each year from 57 Texas counties in its 27 locations. *See* Plaintiffs' Ex. 5. The TDH awarded it funding of almost $3.7 million for the 2004 fiscal year, subject to appropriations, and the organization received almost $700,000 in Medicaid reimbursements last year. *Id.* It performs approximately 4,500 abortions each year at two locations, using private funds. *Id.*

Planned Parenthood of San Antonio and South Central Texas, headquartered in San Antonio, serves over 27,000 patients per year from 28 counties at its eight locations. *See* Plaintiffs' Ex. 6. It received a letter from TDH awarding it $1.386 million for fiscal year 2004, and it expects to receive an additional $400,000 in Medicaid reimbursements during that period. *Id.* In 2002, it performed 1,238 abortions to clients from south-central Texas and Mexico in one San Antonio location, using entirely private funds. *Id.*

Planned Parenthood of West Texas, headquartered in Odessa, serves over 10,000 patients each year from 50 counties. *See* Plaintiffs' Ex. 7. The TDH awarded it $889,554 to serve 7,816 patients during fiscal year 2004, and it expects it would have received approximately $70,000 in Medicaid reimbursements during that period. *Id.* It performs approximately 1,000 abortions each year at its Midland location, using private funds. *Id.* It is the only abortion services provider in the 50–county area. *Id.*

Finally, Planned Parenthood of the Texas Capital Region, headquartered in Austin, provides medical services to approximately 20,000 patients each year in three Austin clinics. *See* Plaintiffs' Ex. 8. The TDH awarded it $667,500 to serve 4900 patients during the fiscal year 2004. *Id.* While this Plaintiff does not currently pro-

vide abortions, it plans to break ground in September 2003 on a new clinic that will provide abortions beginning in September 2004 using private funds. *See* Plaintiffs' Ex. 14.

On June 10, 2003, the TDH sent a letter to the 67 contractors it had approved for continued funding in May 2003 explaining the legislature's passage of Rider 8 and requiring the contractors to return an affidavit to it by June 30, 2003 to be able to receive family planning funds. *See* Defendant's Ex. A–3. In the affidavit, the contractor was required to swear it would not perform elective abortion procedures, contract with or provide any funds to individuals or entities for the performance of abortion procedures, or submit claims for reimbursement of costs of abortion procedures after September 1, 2003. *See* Defendant's Ex. A–4. The TDH has not yet received affidavits from the Plaintiffs, the University of Texas Southwestern Medical Center or Austin Travis County Health & Human Services. *See* Defendant's Ex. A at ¶ 8.

The Plaintiffs filed a lawsuit and application for temporary restraining order on June 26, 2003. After holding a hearing on the application for temporary restraining order on June 30, 2003, at which the parties appeared through counsel of record, the Court granted the Plaintiffs' application for temporary restraining order and suspended the TDH's deadline for receiving the affidavits. The Court set the Plaintiffs' request for preliminary injunction for hearing on July 25, 2003.

## Analysis

### I. Standard for Preliminary Injunction

The Plaintiffs request a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. To obtain a preliminary injunction, a party must show (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened injury to the plaintiffs outweighs the injury to the defendant; and (4) granting the injunction does not disserve the public interest. *Cherokee Pump & Equipment, Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). A preliminary injunction is an "extraordinary remedy" that should not be granted unless a party demonstrates the above four factors by a "clear showing." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir.1997).

### II. Probability of Success on the Merits

#### A. Ripeness

■ The Defendant argues the Plaintiffs' claims are not ripe for review because Rider 8 allows the TDH to waive the requirements of the rider for a year if compliance will result in a significant reduction in family planning services in any region of the State. However, Rider 8 does not include a procedure by which health providers can apply for a waiver, so none of the Plaintiffs knows if it will be granted a waiver. Additionally, the Plaintiffs' lawsuit is not premature because the TDH required them to submit an affidavit by June 30, 2003 swearing they would not perform abortions in order to be eligible to receive the funding the TDH had already approved. Therefore, given the June 30 deadline, the "administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, —— U.S. ——, ——, 123 S.Ct. 2026, 2030, 155 L.Ed.2d 1017 (2003). Moreover, the waiver is only available for one year, while Rider 8 governs appropriations from September 1, 2003 to August 31, 2005. Therefore, the Plaintiffs' claims are ripe for judicial review.

■ The Defendant also contends the claims of Planned Parenthood of Texas Capital Region are not ripe because the organization does not yet provide any abortion services. However, it plans to break ground next month on a new clinic that will provide abortions in September 2004, and the June 30 deadline has a concrete effect on those plans. *See* Plaintiffs' Ex. 14 at ¶ 2. As mentioned above, Rider 8's effects last until August 2005, and it will affect Planned Parenthood of Texas Capital Region's new clinic. Accordingly, the Court finds the organization's claims are ripe for review.

## B. Supremacy Clause Claim

The Plaintiffs contend Rider 8 violates the Supremacy Clause because it imposes restrictions on eligibility for federal funds and use of the funds that are inconsistent with the federal government's restrictions on the funds. Under the Supremacy Clause, the federal Constitution and laws are "the Supreme Law of the Land," and state judges are bound by them notwithstanding contrary state constitutions or laws. *See* U.S. CONST. art. VI., cl. 2.

The Plaintiffs allege Rider 8 improperly adds a restriction on which providers are eligible to receive federal funds, when the federal statutes outlaw the use of federal funds for abortion services but do not restrict providers who perform abortions with private funds from receiving money. The Defendant contends Rider 8 is the only way for it to enforce effectively Congress's intent to prevent federal funding from going to abortion and abortion-related services.

The Defendant also argues the Plaintiffs cannot assert their Supremacy Clause claim because they do not have a right to sue under 42 U.S.C. § 1983. The Plaintiffs argue this Court has jurisdiction over their Supremacy Clause claim under 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

### 1. Right to Sue under Section 1983

■ In their complaint, the Plaintiffs state this action is filed pursuant to 42 U.S.C. § 1983. Under section 1983, a plaintiff may sue a person who, acting under color of state law, deprived it "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To sue under section 1983, a plaintiff must first allege a violation of a federal statutory or constitutional right. The Supremacy Clause itself is not a federal right enforceable under section 1983. *See Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)). To raise a Supremacy Clause argument under section 1983, a plaintiff must first assert a statute that creates an enforceable right under section 1983. *Golden State,* 493 U.S. at 107 n. 4, 110 S.Ct. 444 ("[A] Supremacy Clause claim based on a statutory violation is enforceable under § 1983 only when the statute creates 'rights, privileges, or immunities' in the particular plaintiff.").

The Plaintiffs argue they need not prove a statutory right in order to raise a preemption argument under section 1983. *See St. Thomas—St. John Hotel & Tourism Ass'n v. Gov't of the U.S.V.I.,* 218 F.3d 232, 241 (3d Cir.2000) (finding plaintiffs had standing to sue under section 1983 because "We know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation must confer a right on the party that argues in favor of preemption."). However, in the *St. Thomas* case, the Third Circuit held it had jurisdiction over the case under 28 U.S.C.

§ 1331, not section 1983. *St. Thomas*, 218 F.3d at 241 ("Jurisdiction is established in this case under 28 U.S.C. § 1331.... The Supreme Court has recognized that such a challenge presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."). Additionally, the Third Circuit pointed out the Supreme Court in *Golden State* held the statute at issue in both *Golden State* and *St. Thomas*, the National Labor Relations Act ("NLRA"), did grant employees substantive federal rights, giving rise to a private right to sue under section 1983. *St. Thomas*, 218 F.3d at 241. Therefore, the Third Circuit's holding in *St. Thomas* is not inconsistent with the Supreme Court's holding in *Golden State*, but merely applies the Supreme Court's holding that the NLRA gives employees a private right to sue under section 1983.

■ To demonstrate a federal statute gives a plaintiff a right enforceable under section 1983, "a plaintiff must assert a violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997) (emphasis in original); *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Plaintiffs bear the burden of showing the statute creates an enforceable right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 122 S.Ct. 2268, 2276, 153 L.Ed.2d 309 (2002). In determining whether a plaintiff has asserted a statutory right, courts consider three factors: (1) whether Congress intended that the statutory provision benefit the plaintiff; (2) whether the right asserted is so "vague and amorphous" that enforcement of the right would strain judicial competence; and (3) whether the statute unambiguously imposes a binding obligation on states using mandatory, not precatory, terms. *Blessing*, 520 U.S. at 340–41, 117 S.Ct. at 1359. If the plaintiff

demonstrates a statute creates a right, the rebuttable presumption that the right is enforceable under section 1983 is overcome if Congress specifically foreclosed a remedy under section 1983 expressly or implicitly, by creating a comprehensive enforcement scheme in the statute. *Blessing*, 520 U.S. at 341, 117 S.Ct. at 1360. The Supreme Court recently reiterated "it is *rights*, not the broader or vaguer 'benefits' or 'interests' that may be enforced under the authority of [section 1983]" and "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Gonzaga*, 536 U.S. at 283, 122 S.Ct. at 2275.

■ Only rarely has the Supreme Court held a statute enacted under Congress's spending power creates a right enforceable under section 1983. In *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the first case to recognize section 1983 suits may be brought to enforce rights created by federal statutes, the Court held plaintiffs could recover payments withheld by a state agency in violation of the Social Security Act. In *Wright v. Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the Court held the rent-ceiling provision of the Public Housing Act "was a mandatory limitation focusing on the individual family and its income" and therefore conveyed benefits "sufficiently specific and definite to qualify as enforceable rights." 479 U.S. at 430, 432, 107 S.Ct. at 773–74.

Finally, the Supreme Court in *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), held a reimbursement provision of the Medicaid Act creates an enforceable right for individual health care providers. The provision, the Boren Amendment to the Medicaid Act, requires states to reimburse

health care providers using rates the state "finds, and makes assurances satisfactory to the Secretary" are "reasonable and adequate" to meet the costs of "efficiently and economically operated facilities." *Wilder,* 496 U.S. at 507, 110 S.Ct. at 2516 (quoting the legislative history of Pub.L. No. 92–603).[2] The Court held this provision was undoubtedly intended to benefit health care providers and is not too vague and amorphous because it requires the state "to judge the reasonableness of its rates against the objective benchmark of an 'efficiently and economically operated facilit[y]' providing care in compliance with federal and state standards while at the same time insuring 'reasonable access' to eligible participants." *Wilder,* 496 U.S. at 519, 110 S.Ct. at 2523. The Court was not concerned that states have some discretion in choosing among reasonable methods of calculating rates, because courts can inquire into the reasonableness of the rates and "there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act." *Wilder,* 496 U.S. at 520, 110 S.Ct. at 2523 (emphasis in original).

The *Wilder* decision does not mean all Medicaid Act provisions are enforceable under section 1983, however; the Fifth Circuit recently held a state's failure to "substantially comply" with participation goals or other systemwide performance standards, to adequately train and staff case managers, to report certain data, and to train health care providers in conjunction with its early and periodic screening, diagnostic, and treatment services program under Medicaid may not be challenged under section 1983. *Frazar v. Gilbert,* 300 F.3d 530, 545, 548 (5th Cir.2002), *cert. granted in part sub nom Frew ex rel.*

*Frew v. Hawkins,* —— U.S. ——, 123 S.Ct. 1481, 155 L.Ed.2d 223 (2003). Moreover, the Supreme Court acknowledged it has backed away from the *Wilder* decision in recent years: "Our more recent decisions, however, have rejected attempts to infer enforceable rights from Spending Clause statutes." *Gonzaga,* 122 S.Ct. at 2274. Therefore, it is necessary for the Court to evaluate each statutory provision the Plaintiffs assert and decide whether Congress created a right enforceable under section 1983.

In this case, the Plaintiffs contend they have enforceable rights under the Medicaid Act (Title XIX), Title X and Title XX. They argue these statutes give them the right to participate in the programs because they permit any medical provider to participate in the program and receive funds for services provided so long as they meet the eligibility requirements of the statute. They do not, however, point to any statutory language in any statute conferring this alleged "right to participate" to providers. They simply contend the statutes must create enforceable rights because other courts have allowed plaintiffs to sue to enforce the statutes under section 1983. For instance, the Fifth Circuit in *Hope Medical Group for Women v. Edwards,* 63 F.3d 418 (5th Cir. 1995), considered some medical providers' suit challenging a Louisiana statute limiting Medicaid reimbursements to abortions necessary to save the life of the mother as inconsistent with the Hyde Amendment to the Medicaid Act. The Fifth Circuit did not mention whether section 1983 gave the plaintiffs a right to sue and, if not, what statute gave them a vehicle to sue. Instead, the circuit went directly to the merits of the case, analyzing the Louisiana

---

**2.** Congress repealed the Boren Amendment in August 1997. *See Hospitality House, Inc. v.*

*Gilbert,* 298 F.3d 424, 427 n. 2 (5th Cir.2002).

statute's conflict with various provisions of the Medicaid Act. The court held the Hyde Amendment itself did not impose any obligation on states apart from the general requirements of the Medicaid Act itself, but it found the Louisiana statute violated the requirements of the Medicaid Act: "Given the broad scope of Title XIX, Louisiana's funding restriction is inconsistent with the objectives of the Act because the restriction categorically limits abortions offered through the state's Medicaid program to life and death situations without regard to the medical necessity of abortions in rape and incest cases." *Hope Medical*, 63 F.3d at 427. The court did not focus on a particular provision of the Medicaid Act, although it mentioned the requirements that states cover medically necessary procedures as well as preventive and outpatient services to eligible recipients as evidence that Congress intended the Medicaid Act to have a broad scope. *Hope Medical*, 63 F.3d at 425–27. The Plaintiffs use this case, which concerns what medical services states must reimburse under Medicaid, as support for their argument that Medicaid gives providers a right to participate in the program. *Hope Medical* does not support the broad conclusion that the Medicaid Act gives any provider an enforceable right to sue under section 1983. The Fifth Circuit did not analyze the case under section 1983, and it did not articulate a right under the Medicaid Act.

■ The Plaintiffs also rely on language from the regulations adopted pursuant to Title X stating: "Any public or nonprofit entity in a State may apply for a grant." 42 C.F.R. § 59.3. The Fifth Circuit has not decided whether regulations can provide enforceable rights under section 1983, although it noted even if regulations could create rights, the rights could not be enforceable unless the underlying statute it-self created enforceable rights. *E.g., Gracia v. Brownsville Housing*, 105 F.3d 1053, 1057 (5th Cir.1997). Other circuits are split on the question. *See, e.g., Save Our Valley v. Sound Transit*, 335 F.3d 932, 2003 WL 21544107 (9th Cir. Jul.10, 2003); *South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 274 F.3d 771, 781 (3d Cir.2001); *Harris v. James*, 127 F.3d 993, 1007 (11th Cir.1997); *Doe by Fein v. District of Columbia*, 93 F.3d 861, 867 (D.C.Cir.1996); *Loschiavo v. City of Dearborn*, 33 F.3d 548 (6th Cir.1994); *Smith v. Kirk*, 821 F.2d 980, 984 (4th Cir.1987). Assuming for purposes of this Order that a regulation can create an enforceable right, the Court will consider whether this regulation gives providers an individual entitlement to participate in Title X. On its face, the regulation only allows providers to "apply" for a grant; it does not give providers a right to "participate" in the program if they meet federal requirements but do not meet state requirements.

Because the Plaintiffs have failed to identify a provision in Titles X, XIX and XX that gives them a right enforceable under section 1983, the Court finds they have not shown they are likely to succeed on their section 1983 preemption claim. However, as discussed below, the inability to sue under section 1983 does not eject the Plaintiffs from federal court.

## 2. Jurisdiction under 28 U.S.C. § 1331

Even though the Plaintiffs have not demonstrated a right to sue under section 1983, this Court has jurisdiction over their Supremacy Clause claim under 28 U.S.C. § 1331. Section 1331 gives federal courts original jurisdiction over "all civil actions arising under the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331.

The Supreme Court has ruled on the question of whether section 1331 gives federal courts jurisdiction over claims seeking injunctive and declaratory relief from state laws or regulations that are preempted by federal laws. In *Shaw v. Delta Air Lines,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Court stated:

> It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *See Ex parte Young,* 209 U.S. 123, 160–162, 28 S.Ct. 441, 444–455, 52 L.Ed. 714 (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve. This Court, of course, frequently has resolved pre-emption disputes in a similar jurisdictional posture.

*Shaw,* 463 U.S. at 96 n. 14, 103 S.Ct. 2890 (citations omitted). The Supreme Court relied on its 1908 holding in *Ex parte Young* that federal courts can enjoin state officers from enforcing unconstitutional state laws. *See Ex parte Young,* 209 U.S. at 144–56, 28 S.Ct. 441, 52 L.Ed. 714. The Supreme Court has since reiterated "the availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985).

 Section 1331 gives federal courts jurisdiction over preemption claims even when the federal statute that allegedly preempts the state law or regulation at issue does not give the plaintiff a private cause of action. Recently, the Supreme Court considered whether federal courts have jurisdiction over a telecommunications carrier's challenge to a state utility commission's order as preempted by the federal Telecommunications Act of 1996. *See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). The Court held even though the Telecommunications Act does not create a private cause of action to challenge the state agency's order, the district court still had jurisdiction over the case under section 1331:

> The Commission contends that since the Act does not create a private cause of action to challenge the Commission's order, there is no jurisdiction to entertain such a suit. We need express no opinion on the premise of this argument. "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As we have said, "the district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another,' unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.' " *Ibid.* (citation omitted).

*Verizon,* 122 S.Ct. at 1758–59. Thus, as long as a plaintiff's claim involves a material and non-frivolous question of federal law, federal courts have jurisdiction over it under section 1331.

Lower courts have applied *Shaw* in holding they have federal question jurisdiction under section 1331 over claims that state laws and regulations are preempted by federal laws. In a case involving a non-profit organization's challenge to provisions in the Texas Insurance Code as preempted by ERISA, the Fifth Circuit held the district court had subject matter jurisdiction over the case under section 1331 even though the plaintiff did not have a private right of action under ERISA. *See Self–Ins. Inst. of Am., Inc. v. Korioth*, 993 F.2d 479 (5th Cir.1993). The court found, "The question of preemption is particularly one for the federal courts and arises as much from the Constitution as from ERISA. Therefore, the district court erred in finding that it lacked subject matter jurisdiction." *Korioth*, 993 F.2d at 484. The Fifth Circuit also held the district court had federal question jurisdiction over a suit by pilots challenging a Louisiana regulation of a channel maintained by the Army Corps of Engineers as preempted by the federal Submerged Lands Act. *See Gillis v. Louisiana*, 294 F.3d 755, 760 (5th Cir.2002). The court stated: "Because the Pilots are implicitly seeking injunctive relief based on a federal statute, federal question jurisdiction clearly exists based on *Shaw*." *Gillis*, 294 F.3d at 760. The court also noted the Supreme Court since *Shaw* has clarified the holding was a "general rule" not limited to ERISA cases. *Gillis*, 294 F.3d at 760 (quoting *Lawrence County v. Lead–Deadwood Sch. Dist. No. 40–1*, 469 U.S. 256, 260 n. 6, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985)).

The Second Circuit relied on *Shaw* to conclude it had federal question jurisdiction over a suit by a public works contractor to enjoin the New York Department of Labor from enforcing a state wage law, alleging the state law was preempted by ERISA. *See Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000 (2d Cir.1997). The court distinguished the Supreme Court's holding in *Golden State* as applying to the context where a plaintiff sued for damages under section 1983, not for injunctive relief. *Burgio*, 107 F.3d at 1007 n. 2. The Seventh Circuit held section 1331 supplied federal jurisdiction in a suit brought by an association of mortgage lenders challenging state loan regulations as preempted by the federal Home Ownership and Equity Protection Act. *See Ill. Ass'n of Mortgage Brokers v. Office of Banks & Real Estate*, 308 F.3d 762, 765 (7th Cir.2002). Even though the plaintiff sued under section 1983, the court found it unnecessary to determine whether the federal statute created an enforceable right under section 1983 because the court had jurisdiction over section 1331 "when the plaintiff seeks declaratory relief against regulation by a state agency and contends that the agency has violated federal law by adopting particular regulations." *Mortgage Brokers*, 308 F.3d at 765. Additionally, the Third Circuit held it had federal question jurisdiction over a suit by tourism associations to enjoin the enforcement of a Virgin Islands law as preempted by the federal National Labor Relations Act. *St. Thomas*, 218 F.3d at 241.

*Shaw* and the other cases holding federal courts have section 1331 jurisdiction over preemption cases may explain the Fifth Circuit's holding in *Hope Medical* and other courts' holdings in similar abortion-related cases. The *Hope Medical* court did not mention section 1983 or section 1331 and did not articulate which jurisdictional statute gave it jurisdiction over the health care providers' preemption challenge to a Louisiana statute, but it implicitly found jurisdiction, since it examined the merits of the preemption argument. *Hope Medical*, 63 F.3d at 427. The Tenth Circuit in *Planned Parenthood Ass'n of Utah v. Dandoy*, 810 F.2d 984 (10th Cir.

1987), upheld an injunction preventing a state agency from enforcing a state law that conflicted with the federal Medicaid requirements. However, the court did not state what statute gave it jurisdiction over the plaintiff's preemption claim. Similarly, the Eighth Circuit in *Valley Family Planning v. North Dakota,* 661 F.2d 99 (8th Cir.1981), held a North Dakota statute conflicted with Title X and was therefore invalid under the Supremacy Clause, but did not articulate how it had jurisdiction over the action. *Valley Family Planning,* 661 F.2d at 100–01. It is difficult to discern where these courts found jurisdiction, since they did not address the issue, but it is possible they presumed they had federal question jurisdiction under section 1331 since the cases involved preemption of state statutes by federal law.

The Court finds it has federal question jurisdiction over this case under section 1331. The Plaintiffs argue Rider 8 is preempted by Titles X, XIX and XX and therefore violates the Supremacy Clause. Their arguments will be sustained if the Court adopts one construction of these federal laws and denied if the Court adopts another. *Verizon,* 122 S.Ct. at 1758–59. The Defendant does not argue their preemption claim is immaterial to their case or frivolous. Therefore, the case presents a federal question under section 1331.

### 3. Jurisdiction under 28 U.S.C. § 1343 and 28 U.S.C. § 2201

■ The Plaintiffs also contend the Court has jurisdiction over this case under 28 U.S.C. § 1343 and 28 U.S.C. § 2201. Section 1343 gives federal courts jurisdiction over "any civil action authorized by law" to redress deprivation under state law of any right, privilege or immunity secured by the Constitution or federal laws providing for equal rights or protection of civil rights. *See* 28 U.S.C. § 1343. However,

the Supreme Court has held Congress intended section 1983 and section 1343 to be complementary, and therefore their coverage is coextensive. *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 616, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979); *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero,* 426 U.S. 572, 583 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). These holdings lead to the inference that a plaintiff who cannot sue under section 1983 cannot sue under section 1343. Additionally, section 1343 requires a plaintiff to identify a federal law providing for equal rights or for the protection of civil rights— neither of which the statutes at issue in this case do. Therefore, section 1343 does not give this Court jurisdiction over this case.

■ Section 2201, the Declaratory Judgment Act, likewise does not give this Court jurisdiction. The Fifth Circuit has held this statute cannot be an independent source of jurisdiction but merely permits an award of declaratory judgment when a court has another basis for jurisdiction. *See Jones v. Alexander,* 609 F.2d 778, 781 (5th Cir.1980).

### 4. Merits of Supremacy Clause Claim

■ Having determined the Court has jurisdiction over the Plaintiffs' Supremacy Clause claim, the Court must now consider the Plaintiffs' probability of success on the merits of the claim. Under the doctrine of preemption, which is rooted in the Supremacy Clause, "state law is nullified to the extent that it actually conflicts with federal law." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). State law conflicts with federal law when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fi-*

*delity,* 458 U.S. at 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Therefore, to determine whether federal law preempts a state law, courts must look to congressional intent. *Fidelity,* 458 U.S. at 152, 102 S.Ct. 3014, 73 L.Ed.2d 664. Federal regulations have preemptive effect equal to federal statutes. *Fidelity,* 458 U.S. at 153, 102 S.Ct. 3014.

In the context of federal spending statutes, the Supreme Court has stated:

> There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid.

*King v. Smith,* 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Thus, this Court must consider whether Rider 8 obstructs the full accomplishment of Congress's intent as demonstrated through the statutes and regulations or is inconsistent with the terms and conditions Congress established for the state to receive federal funding.

The Plaintiffs argue Rider 8 is inconsistent with Congress's objective of providing family planning and medical services to those in need because it limits which health care providers can receive federal funds and, therefore, which patients can receive the intended care. Rider 8 places an additional eligibility requirement on recipients so that even if a provider meets the federal eligibility requirements, it will not receive federal funding if it performs abortion procedures with private funds or even contracts with or provides funding to an entity that performs abortion procedures. None of the statutes at issue in this case precludes eligible providers who also provide abortions using private funds or contract with or give private funds to entities that perform abortions from receiving federal funding. Additionally, none of the statutes contain any restriction on services recipients can provide with their private funds. The regulations adopted pursuant to Title X state: "Any public or nonprofit entity in a State may apply for a grant." 42 C.F.R. § 59.3.

Other courts have enjoined state laws and regulations that add eligibility requirements to federal funding statutes. In *Carleson v. Remillard,* 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972), the Supreme Court invalidated a state law that prevented children whose fathers were serving in the military from receiving AFDC benefits, finding Congress did not intend to exclude a class of benefit recipients. *Carleson,* 406 U.S. at 604, 92 S.Ct. 1932, 32 L.Ed.2d 352. In *Jones v. T.H.,* 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976), the Supreme Court affirmed a three-judge district court's holding that a Utah regulation was inconsistent with Title XIX. The Utah regulation prohibited health care providers from giving minors federally-funded family planning assistance absent parental consent. *See T.H. v. Jones,* 425 F.Supp. 873, 875–76 (D.Utah 1975). The court held the Utah regulation conflicted with federal law because "[t]he state's regulations impermissibly engraft upon the federal scheme a condition for eligibility where Congress has undertaken fully to define the class of persons who may receive family planning assistance." *T.H.,* 425 F.Supp. at 878. This conflict, the court found, "constitutes an important disagreement affecting the scope and effect of federal family planning assistance. Under such circumstances, federal law must control." *T.H.,* 425 F.Supp. at 880.

Following the *T.H.* decision, the Tenth Circuit invalidated a Utah statute prohibit-

ing medical providers from receiving Medicaid reimbursement for providing contraceptive services to minors without parental consent. *See Planned Parenthood Ass'n of Utah v. Dandoy,* 810 F.2d 984 (10th Cir.1987). The court found the state requirement conflicted with Title XIX because:

> The defendant provides the services to some persons eligible under Title XIX but not to others. The defendant thus has excluded some persons from the general group who are eligible for the particular health care here concerned. The result is that care to designated individuals in this large group to whom health care is to be available is refused by the state imposed condition.

*Dandoy,* 810 F.2d at 988. The court clarified the choice states must make when choosing to received federal funding: "Utah may participate in the program and thereby accept the conditions attached by the federal acts which may be contrary to state law or unwanted or instead choose not to participate and to use its own funds as it wishes." *Dandoy,* 810 F.2d at 988.

The Eighth Circuit found a North Dakota statute inconsistent with Title X because it withheld Title X funds from "any person, public or private agency which performs, refers, or encourages abortion." *Valley Family Planning v. North Dakota,* 661 F.2d 99, 100 (8th Cir.1981). The court held the statute conflicted with "Title X's mandate that comprehensive health care be provided, including referrals to other services when medically indicated." *Valley Family Planning,* 661 F.2d at 102. Therefore, the court held the statute was invalid under the Supremacy Clause. Finally, the Montana District Court held unconstitutional a Montana statute making receipt of family planning funds under Title X "contingent upon the recipient providing such services in a physical plant that does not contain an abortion clinic or facility that performs abortions." *Planned Parenthood of Billings, Inc. v. Montana,* 648 F.Supp. 47, 49 (D.Mont.1986). The court found this state law requirement conflicted with Title X because Planned Parenthood would not be eligible to receive the Title X funds for the sole reason that it was located in the same building as a nonprofit organization that provided abortions. While the court acknowledged Title X prohibited the use of federal funds for programs where abortion is a method of family planning, it noted, "Nowhere [in Title X] is a family planning service prohibited from co-locating with a facility performing abortions or any other facility for that matter." *Planned Parenthood of Billings,* 648 F.Supp. at 50.

This case involves an extra eligibility requirement for federal funds similar to those above. These cases establish a state cannot withhold funds from providers who met the federal eligibility requirements simply because the providers do not meet the state's additional requirement. Here, Texas is withholding funds from otherwise eligible providers who provide covered family planning services to eligible recipients, solely because of activities the providers perform with private funding.

The Defendant contends Rider 8 is consistent with Congress's purpose of ensuring no federal funding is used to provide abortions. Title X, which subsidizes family planning services for low-income people, states: "None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a–6. Under the Hyde Amendment to the appropriations bill, passed every year since 1981, Title XIX Medicaid funds cannot be used to pay for abortions except when the pregnancy results from rape or incest or the life of

the mother is in danger.[3] *See* Consolidated Appropriations Act, Pub.L. 108–7, 117 Stat. 11 (2003). Title XX does not explicitly mention abortion, although its funds may not be used for the provision of medical care. *See* 42 U.S.C. § 1397d(4). The above statutory language does not go so far as to prohibit entities that use private funds for abortion services from receiving federal funding to provide non-abortion-related services. The statutes simply prevent federal funds from supporting "programs" that provide abortions; they do not exclude funds from health care providers that provide abortions outside of the federally-funded "program." As the Supreme Court explained:

> Title X expressly distinguishes between a Title X *grantee* and a Title X *project.* The grantee, which normally is a healthcare organization, may receive funds from a variety of sources for a variety of purposes. The grantee receives Title X funds, however, for the specific and limited purpose of establishing and operating a Title X project. 42 U.S.C. § 300(a). The regulations govern the scope of the Title X *project's* activities, and leave the grantee unfettered in its other activities. The Title X *grantee* can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds. 42 C.F.R. § 59.9 (1989).

*Rust v. Sullivan,* 500 U.S. 173, 196, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (emphasis in original) (citation to brief omitted).

The TDH argues Rider 8 is the only way for it to enforce the statutory requirements that no federal funding may be given to programs that provide abortion. However, the record demonstrates, and TDH has admitted, it has never encountered a situation where any Planned Parenthood entity, or other recipient for that matter, was using federal funds to provide abortion services. The most recent audit TDH performed for each Plaintiff concluded the Plaintiffs have not used and are not using their subsidies for abortions or abortion-related activities. *See* Plaintiffs' Ex. 9–13. Additionally, the annual audits of each Plaintiff by independent auditors have determined the Plaintiffs comply with the federal requirements. *Id.* The TDH argues because of the current "budget crunch," it does not have enough resources to monitor funding recipients sufficiently to ensure they are not using the funds for abortion services. The TDH can only audit high-risk entities every three to four years and other entities every six to eight years, and it does not consider annual audits by independent private auditors to be sufficient. *See* Defendant's Ex. B.

The Plaintiffs' affidavits indicate they go to extraordinary lengths to ensure the abortion services they provide are separate from their federally-funded services. Planned Parenthood of Houston and Southeast Texas provides abortions at only two of its clinic locations: in Bryan, the family planning services clinic operates five days per week and the abortion clinic operates on a different day, and in Houston, the abortion clinic is in the same building as the family planning clinic but in an entirely separate space. *See* Plaintiffs' Ex. 4 at ¶¶ 10–11. The budgets of the abortion clinics are kept separate from the family planning clinics' budgets. *Id.* at

---

**3.** The Plaintiffs do not dispute that Rider 8 does not prevent Medicaid reimbursement for abortions allowed under the Hyde Amendment, because the Texas Medicaid Manual does not characterize these services in the area of "family planning" services but allows them to be reimbursed as physician/gynecological services. *See* Defendant's Ex. 2 & 3.

¶ 12. Planned Parenthood of Central Texas provides abortions at one of its two clinics, and that clinic receives TDH funds only for reimbursing Medicaid beneficiaries for covered services. *See* Plaintiffs' Ex. 3 at ¶ 6. Planned Parenthood of North Texas provides abortion at two of its twenty-seven locations: in Dallas, abortions are performed in a surgical center that offers no family planning services, and in Fort Worth, abortions are offered on a different day of the week than the family planning clinic. *See* Plaintiffs' Ex. 5 at ¶¶ 5, 9–10. Planned Parenthood of San Antonio and South Central Texas provides abortion services at one San Antonio site that is not one of the five clinics funded through its contract with TDH. *See* Plaintiffs' Ex. 6 at ¶ 10. Planned Parenthood of West Texas performs abortions at its Midland location only, on a day of the week when it does not provide subsidized family planning services. *See* Plaintiffs' Ex. 7 at ¶¶ 9–10. Planned Parenthood of the Texas Capital Region does not yet provide abortions, but it plans to open a separate clinic next year where it will provide abortions using private funds. *See* Plaintiffs' Ex. 8 at ¶ 9.

It is clear from the record the Plaintiffs take the federal requirements extremely seriously, given the possibility that a violation could terminate their funding, and the Defendant has given the Court no reason to anticipate the Plaintiffs will flout the requirements in the future. Additionally, a state's budget problems cannot serve as an excuse for altering federal eligibility requirements for federal funding; if they could, the federal requirements would become superfluous. States are not required to receive federal funding, but when they do, they must follow federal requirements. Based on the record before the Court at this time, the Court finds the Plaintiffs have demonstrated a probability of success on the merits of their Supremacy Clause claim.

## C. Fourteenth Amendment Claims

The Plaintiffs also allege Rider 8 violates their right to privacy under the Due Process Clause of the Fourteenth Amendment because it unconstitutionally prohibits them from receiving a subsidy because they participate in the constitutionally-protected activity of providing abortion services to women, and it places an undue burden on women seeking to exercise their right to choose to have an abortion. The Defendant maintains Rider 8 does not unduly burden a woman's right to choose to terminate her pregnancy.

### 1. Unconstitutional Condition

 The Plaintiffs allege Rider 8 places an unconstitutional condition on their receipt of federal funding. Under the unconstitutional conditions doctrine, although a person has no "right" to government funding, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). By being denied a benefit because the applicant has exercised his constitutional rights, the applicant's "exercise of those freedoms would in effect be penalized and inhibited," a result the government "'could not command directly.'" *Perry,* 408 U.S. at 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). As the Supreme Court explained in the context of Title X funding restrictions on abortion-related activities, "our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the

federally funded program." *Rust,* .500 U.S. at 197, 111 S.Ct. 1759, 114 L.Ed.2d 233 (emphasis in original). Funding conditions that fall under this doctrine must be shown to be "necessary to promote a compelling governmental interest." *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

The first question is whether the Plaintiffs are engaging in a constitutionally protected activity. The Plaintiffs argue performing abortions—assisting women in exercising their right to choose whether to terminate their pregnancies—is a constitutionally protected activity. A woman does not have a fundamental right to have an abortion, but she has a right to be free from "unduly burdensome interference with her freedom to decide whether to terminate her pregnancy." *Maher v. Roe,* 432 U.S. 464, 474, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). While the Plaintiffs concede the Supreme Court has not explicitly held abortion providers have a constitutional right to perform abortions,[4] the Supreme Court has noted, "A woman cannot safely secure an abortion without the aid of a physician, and an impecunious woman cannot easily secure an abortion without the physician's being paid by the State. The woman's exercise of her right to an abortion, whatever its dimension, is therefore necessarily at stake here." *Singleton,* 428 U.S. at 117, 96 S.Ct. 2868. In an unconstitutional conditions case where the Supreme Court rejected the argument that "private physicians have some kind of constitutional right of access to public facilities for the performance of abortions," it noted in a footnote: "This case might also be different if the State barred doctors who performed abortions in private facilities from the use of public facilities for any purpose." *Webster v. Reproductive Health Serv.,* 492 U.S. 490, 510 n. 8, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). This footnote intimates that doctors would have a constitutional concern in such a case.[5] However, in considering whether the doctor-patient relationship was constitutionally protected, the Supreme Court indicated the only doctors' rights at stake in challenges to abortion laws are those derivative of the woman's right to privacy. *See Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 884, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("Whatever constitutional status the doctor-patient relation may have as a general matter, in the present context it is derivative of the woman's position. The doctor-patient relation does not underlie or override the two more general rights under which the abortion right is justified: the right to make family decisions and the right to physical autonomy.").

Lower courts do not provide much more clarity about abortion providers' constitutionally protected interests. The Eighth Circuit considered whether a Missouri statute preventing abortion providers from receiving state family planning funds placed an unconstitutional condition on the abortion providers. *See Planned Parent-*

---

4. In *Rust v. Sullivan,* while the case involved funding restrictions for abortion-related services, the constitutional right at stake was "the right to engage in abortion advocacy and counseling," protected by the First Amendment. *Rust,* 500 U.S. at 196, 111 S.Ct. 1759, 114 L.Ed.2d 233.

5. Similarly, when the Supreme Court held the Hyde Amendment to the Medicaid Act does not constitutionally impinge on a woman's freedom of choice, it noted: "A substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion." *Harris v. McRae,* 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

*hood of Mid–Mo. & Eastern Kan., Inc. v. Dempsey,* 167 F.3d 458 (8th Cir.1999). Specifically, the court considered "whether [the state law] prohibits grantees from engaging in abortion services through independent affiliates." *Dempsey,* 167 F.3d at 462. Such language indicates the court assumed "engaging in abortion services" is a constitutionally-protected right. The court found the statute would be an unconstitutional condition "if [the court] interpreted it to prohibit grantees from having any affiliation with abortion service providers." *Dempsey,* 167 F.3d at 463. Because the court construed the statutory language to permit grantees to affiliate with abortion service providers, it held the statute was not an unconstitutional condition. It is unclear whether the court relied on the right to provide abortion services in its unconstitutional conditions analysis or if it considered the right to affiliate with abortion providers to be a First Amendment right. Later in the opinion, when discussing the plaintiff's Fourteenth Amendment Equal Protection claim, the court states: "Any constitutional right of clinics to provide abortion services, however, is derived directly from women's constitutional right to choose abortion." *Dempsey,* 167 F.3d at 464. However, the court does not establish whether abortion providers do have a derivative constitutional right—*e.g.,* a right to assist women in exercising their right to choose. While the *Dempsey* opinion is confusing, it does indicate abortion providers have some constitutionally protected right to provide their services.

The Ninth Circuit decided a similar case involving an Arizona statute precluding abortion providers from receiving state social welfare funds. *Planned Parenthood of Central & Northern Ariz. v. Arizona,* 718 F.2d 938 (9th Cir.1983). The court considered "whether the State unduly interfered with Planned Parenthood's exercise of its right to perform abortion and abortion-related services." *Planned Parenthood (Ariz.),* 718 F.2d at 944. The court reversed summary judgment and remanded to give the state the opportunity to prove the statute was "drawn as narrowly as possible" to accomplish the state interest of ensuring state funds would not be used for abortion services. *Planned Parenthood (Ariz.),* 718 F.2d at 945. While the decision also discusses the plaintiff's free speech claim challenging the prohibition on abortion referrals and counseling, the opinion seems to acknowledge a broader right to perform abortion services. However, as above, this holding is not unequivocal.

While the precedent is far from clear, this Court reads the language in the above Supreme Court opinions to acknowledge abortion providers have some constitutionally-protected right, derived from their patients' rights, to perform the services that are necessary to enable women to exercise their own constitutional rights. This derivative right stems from the fact that, as abortion providers who help women to realize their constitutional rights safely, the Plaintiffs are in a unique position to assert their patients' constitutional rights. Therefore, the Court holds the Plaintiffs are engaging in a constitutionally protected activity.

Because Rider 8 withholds funding from the Plaintiffs because they engage in a constitutionally protected activity, it creates an unconstitutional condition. This case is therefore different from *Rust v. Sullivan,* where the Supreme Court found no unconstitutional condition because "[b]y requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has . . . not denied it the right to engage in abortion-related activities." *Rust,* 500 U.S. at 198, 111 S.Ct. 1759, 114 L.Ed.2d 233. Here, the state withholds

funding from the Plaintiffs because they provide abortion services with separate, private funds. The state contends it is not penalizing the Plaintiffs, because the Supreme Court has held refusal to fund a protected activity is not a penalty. This is true: the Supreme Court has held the refusal to fund a protected activity is not the same as an imposition of a penalty on that activity. *United States v. Am. Library Ass'n,* — U.S. ——, ——, 123 S.Ct. 2297, 2308, 156 L.Ed.2d 221 (2003) (quoting *Rust,* 500 U.S. at 193, 111 S.Ct. 1759, 114 L.Ed.2d 233). This case, however, involves the refusal to fund an *entity* because of protected activities it engages in using private funds. Thus, while refusal to fund abortion does not impose an unconstitutional restriction on abortion, refusal to fund entities because they provide abortions with private funds presents a different situation.

Because Rider 8 constitutes an unconstitutional penalty, the TDH must demonstrate Rider 8 is necessary to accomplish a compelling state interest. Assuming the state's interests in removing the imprimatur of state funding of abortion services and safeguarding the federal prohibition on the funding of abortion are compelling interests, the TDH has not shown Rider 8 is necessary to accomplish these interests. The record demonstrates the TDH has never experienced a violation of state or federal restrictions on the funding of abortion and the Plaintiffs go to enormous efforts to keep their subsidized family planning services and privately-funded abortion services separated. Accordingly, the Court finds the Plaintiffs have shown a likelihood of success on the merits of their unconstitutional conditions claim.

### 2. Undue Burden

█ The Plaintiffs also contend Rider 8 places an undue burden on their patients'

right to choose to terminate their pregnancies. Health care providers have standing to raise constitutional rights on behalf of their patients, so long as they meet the requirements for Article III standing. *See Singleton v. Wulff,* 428 U.S. 106, 118, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("It is generally appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision"); *Okpalobi v. Foster,* 190 F.3d 337, 352 (5th Cir.1999) ("The general rule, as formulated by *Singleton,* is that physicians have standing to raise challenges to laws regulating abortion based on the constitutional rights of their patients because they can adequately represent the patients' interest."); *see also Planned Parenthood of Minn., Inc. v. Citizens for Community Action,* 558 F.2d 861, 865 n. 3 (8th Cir.1977). The Defendant does not contest the Plaintiffs face a concrete injury if they do not receive the funding they were conditionally awarded in March 2003; and that injury will be redressed if the Defendant is enjoined from enforcing Rider 8. Therefore, Article III standing is apparent, and the Plaintiffs have a right to assert their patients' constitutional right to be free from an undue burden when choosing whether to terminate their pregnancies. *Singleton,* 428 U.S. at 117, 96 S.Ct. 2868 ("Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision.").

A law constitutes an undue burden if it "has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey,* 505 U.S. at 877, 112 S.Ct. 2791, 120 L.Ed.2d 674. The Supreme Court has held when a state refuses to fund abortion, "[a]n indigent woman who desires an abortion suffers no disadvantage as a consequence of [the state's] decision to fund childbirth;

she continues as before to be dependent on private sources for the services she desires." *Maher*, 432 U.S. at 474, 97 S.Ct. 2376, 53 L.Ed.2d 484. Additionally, the Supreme Court held Title X regulations prohibiting Title X projects from referring pregnant women to abortion providers did not impose an undue burden because "Congress' refusal to fund abortion counseling and advocacy leaves a pregnant woman with the same choices as if the Government had chosen not to fund family-planning services at all." *Rust*, 500 U.S. at 202, 111 S.Ct. 1759, 114 L.Ed.2d 233. The Supreme Court also held the Hyde Amendment to the Medicaid Act "leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have if Congress had chosen to subsidize no health care costs at all." *McRae*, 448 U.S. at 317, 100 S.Ct. 2671, 65 L.Ed.2d 784.

This case differs from the above cases because the Plaintiffs do not challenge the government's decision not to fund abortion procedures, but the state's decision not to award family planning funding already approved by the federal government to entities that also provide abortions with private funds. Thus, the practical impact of Rider 8 is to shut down private resources formerly available to women, not simply to deny public funding to them. However, the Eighth Circuit held a statute withholding state funds from recipients who provided abortions with private funds "would have at most an extremely attenuated effect upon the availability of abortion services." *Dempsey*, 167 F.3d at 465. Similarly, in this case, Rider 8 leaves the private abortion funds intact and merely withholds public funds that have never covered abortion services. While the real impact on abortion providers is evident, it is a tangential impact (albeit an apparently intended one) and therefore does not qualify as an "undue burden" as defined by precedent.

## III. Irreparable Harm

The Plaintiffs contend they and their patients face a substantial threat of suffering irreparable harm if a preliminary injunction is not granted. If they do not sign the TDH affidavit, they will lose millions of dollars in funding for family planning services and Medicaid reimbursements and will be required to close clinics and lay off staff, and even if the funding were to be reinstated in the future, the Plaintiffs doubt they could repair this damage and resume normal operations. *See* Plaintiffs' Ex. 3 at ¶ 12 (Planned Parenthood of Central Texas would lose more than $650,000 in funding and would have to cut staff and perhaps close the Mary Ruth Duncan Women's Health Center); Plaintiffs' Ex. 4 at ¶ 17 (Planned Parenthood of Houston and South Texas would lose more than $3 million in funding and would have to reduce family planning services, lay off staff members and even close clinics); Plaintiffs' Ex. 5 at ¶ 16 (Planned Parenthood of North Texas would lose more than $4 million in funding and would have no choice but to close clinics, especially in rural areas); Plaintiffs' Ex. 6 at ¶ 16 (Planned Parenthood of San Antonio and South Central Texas would lose over $1.75 million in funding and may have to lay off staff members and close clinics); Plaintiffs' Ex. 7 at ¶ 16 (Planned Parenthood of West Texas would lose almost $1 million in funding and would have to significantly reduce family planning services, lay off staff members and even close clinics); Plaintiffs' Ex. 8 at ¶ 14 (Planned Parenthood of the Texas Capital Region would lose more than $800,000 and have to reduce services, lay off staff or close clinics). Thus, the Plaintiffs' failure to sign the affidavit will substantially reduce family planning services

to women throughout Texas—services that Congress clearly intended to fund.

Additionally, the Plaintiffs and their patients will suffer irreparable harm if the Plaintiffs do sign the TDH affidavit, because the Plaintiffs will not be able to assist women in obtaining safe abortions, and patients seeking abortion services will be forced to travel long distances, travel to Mexico, delay obtaining an abortion, resort to unsafe methods of abortion, or forgo their constitutionally protected right. *See* Plaintiffs' Ex. 4 at ¶ 16; Plaintiffs' Ex. 5 at ¶ 15; Plaintiffs' Ex. 6 at ¶ 16. Two of the Plaintiffs are the only abortion providers in their respective areas. *See* Plaintiffs' Ex. 3 at ¶ 11 (Planned Parenthood of Central Texas is the only abortion provider in its seven-county service area); Plaintiffs' Ex. 7 at ¶ 15 (nearest abortion provider to Planned Parenthood of West Texas is 140 miles away).

The TDH argues the Plaintiffs will not suffer irreparable injury because they can continue receiving family planning funds and also can continue to provide abortions if they simply create a separate affiliate that provides abortion services. As the Defendant articulated at the hearing, Planned Parenthood of Central Texas could divide into a "Family Planning" entity and an "Abortion Services" entity. Such a suggestion is absurd in light of the stated purpose of Rider 8—to eradicate the supposed imprimatur of state funding of abortion that currently exists—which would be undermined if recipients could avoid Rider 8 simply by creating affiliates and making no substantive changes. Moreover, under Rider 8, funding recipients cannot provide any funds to or contract with an abortion provider. This restriction makes it difficult, if not impossible, for Plaintiffs to support an affiliate. For instance, if Planned Parenthood's Family Planning entity wanted to

sub-lease clinic space to the Abortion Services affiliate one day each week, it would run afoul of the "no contracting" restriction in Rider 8. Thus, the TDH's solution does not cure the threatened irreparable injury to the Plaintiffs.

## IV. Harm to Defendant

The Plaintiffs must show their threat of irreparable harm outweighs the potential injury the Defendant faces if a preliminary injunction is granted. The Defendant claims an injunction will prevent it from guaranteeing uninterrupted family planning services to Texas women. However, by preventing the enforcement of Rider 8, the Court allows the TDH to proceed under its contracts awarding family planning funding to the Plaintiffs. Therefore, Texas women should see no interruption in federally-funded family planning services available to them.

## V. Public Interest

The Plaintiffs must show the public interest is served by granting an injunction. As stated above, Rider 8 will either result in a reduction in family planning services Congress intended to fund or a reduction in abortion services available to women seeking to exercise their constitutional right to choose to terminate their pregnancies. Family planning services include physical examinations, screening for cancer and sexually transmitted diseases, contraception, pregnancy testing, and counseling. Congress intended to subsidize these services under three separate spending statutes. The TDH's assessment of the impact of Rider 8 shows these services will be substantially reduced in certain areas if the Plaintiffs do not continue to provide them. *See* Plaintiffs' Ex. 15. The Planned Parenthood of Houston and Southeast Texas is the only family planning provider in Region 5, which includes

15 counties, and in the eastern part of Region 7. *Id.* The Planned Parenthood of Central Texas is the only family planning contractor in McLennan County and the other northeastern counties in Region 7. *Id.* The Planned Parenthood of North Texas is the only family planning services provider for the eastern part of Region 4. *Id.* The Planned Parenthood of West Texas is one of two family planning contractors in Region 9, which covers 24 counties. *Id.* The TDH has concluded the Plaintiffs collectively provide family planning services to 63.3 percent of the women in need in Texas.

The record clearly demonstrates the Plaintiffs are instrumental to ensuring Texas women receive the family planning services Congress intended to fund. The Defendant has not convinced the Court it can find substitute providers of these important services, particularly in rural areas like west Texas. The Court finds the public interest will certainly be served by allowing the Plaintiffs to continue receiving federal funds to provide these crucial services to women throughout Texas.

In accordance with the foregoing:

IT IS ORDERED that Plaintiffs' Application for Preliminary Injunction [# 7] is GRANTED.

### ORDER OF PRELIMINARY INJUNCTION

BE IT REMEMBERED on the 4th day of August 2003 the Court, having entered its order of this date granting plaintiffs' application for preliminary injunction, enters the following:

IT IS ORDERED, ADJUDGED, and DECREED that Eduardo J. Sanchez, the Texas Commissioner of Health of the State of Texas and his agents, employees, appointees, and successors are HEREBY ENJOINED from enforcing, threatening to enforce, or otherwise ap-

plying the provisions of paragraphs (b) and (c) of Rider 8 of the Texas General Appropriations Act (House Bill 1) passed by the Texas Legislature on June 2, 2003, and signed into law by Governor Rick Perry on June 22, 2003;

IT IS FURTHER ORDERED that there is no requirement of any bond and that this injunctive relief is effective upon service.