United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 11, 2005**

Charles R. Fulbruge III
Clerk

REVISED MARCH 30, 2005
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-50930

PLANNED PARENTHOOD OF HOUSTON AND SOUTHEAST TEXAS;
PLANNED PARENTHOOD OF NORTH TEXAS;
PLANNED PARENTHOOD OF SAN ANTONIO AND SOUTH CENTRAL TEXAS;
PLANNED PARENTHOOD OF WEST TEXAS;
PLANNED PARENTHOOD OF THE TEXAS CAPITAL REGION;
PLANNED PARENTHOOD OF CENTRAL TEXAS,

Plaintiffs-Appellees,

versus

EDUARDO J SANCHEZ, Texas Commissioner of Health,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas
USDC No. A-03-CA-415-SS

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The Texas Legislature restricted the distribution of federal family planning funds. Finding this state legislation likely preempted by federal spending statutes, the district court granted a preliminary injunction against its enforcement. The district court concluded that the state legislation could not be interpreted to permit various Planned Parenthood organizations to continue

1

receiving federal funds by creating independent affiliates.  We disagree.  Persuaded that the state legislation does admit of this potentially saving construction, we remand for further proceedings.

I

The State of Texas voluntarily participates in several federal programs that provide funds for family planning services.  Among these programs are Title X of the Public Health Service Act,[1] which provides project grants to public and private agencies for family planning services, and Title XX of the Social Security Act,[2] which provides block grants to the states for social services, including family planning.  The regulations for Title X specify that funds may not be used to finance abortions or abortion-related activity.[3] Both parties agree that any Title XX funds used to match Title X funds are subject to the same restrictions.  Furthermore, Title XX funds may not be used for the provision of medical care.[4]  The State also receives Medicaid funding under Title XIX of the Social

---

[1] 42 U.S.C. § 300 *et seq.*

[2] 42 U.S.C. § 1397 *et seq.*

[3] Title X provides that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.

[4] 42 U.S.C. § 1397d(a)(4) ("[G]rants made under this subchapter may not be used by the State, or by any other person with which the State makes arrangements to carry out the purposes of this subchapter . . . for the provision of medical care (other than family planning services, rehabilitation services, or initial detoxification of an alcoholic or drug dependent individual) unless it is an integral but subordinate part of a social service for which grants may be used under this subchapter.").

Security Act,[5] which provides medical care to the needy through a cooperative federal-state program.

The Texas Department of Health (TDH)[6] distributes federal family program grants under Titles X and XX. On May 8, 2003, TDH sent letters to the family planning contractors that had been approved to receive funding under TDH's federal family planning program grants.[7] Appellees--six Planned Parenthood entities located in various parts of Texas that had been contractors in Texas's family planning program for many years--were among the groups approved for funding. Pursuant to Title X's statutory requirements, Appellees strictly segregated their Title X programs from their abortion-related activities to ensure that no federal funds were used for abortions.[8] Thus, Appellees provided Title X and XX family planning services using the federal funds disbursed by TDH, and provided abortion services using private funding. There is no evidence in the record to suggest that Title X or XX funds were ever improperly commingled with private abortion funds.

---

[5] 42 U.S.C. § 1396 *et seq.*

[6] TDH became part of the Texas Department of State Health Services (TDSHS) on September 1, 2004. *See* Act of June 10, 2003, 78th Leg., R.S., Tex. H.B. 2292. Eduardo J. Sanchez, previously the Texas Commissioner of Health, is now the Commissioner of the TDSHS. For simplicity we will continue refer to the defendant as TDH.

[7] The letters stated that the "funding award is subject to change as a result of legislation and/or changes in appropriations."

[8] One of the Appellees, Planned Parenthood of the Texas Capital Region, had not yet begun providing abortions but intended to "break ground" on the construction of an abortion clinic in September 2003.

Just under one month later, on June 2, 2003, the Texas Legislature passed the Texas General Appropriations Act.[9]  The Act included Rider 8, a provision restricting distribution of federal family planning money, including Title X and XX funds.[10]  Rider 8 provides:

8.  Prohibition on Abortions

a. It is the intent of the Legislature that no funds shall be used to pay the direct or indirect costs (including overhead, rent, phones and utilities) of abortion procedures provided by contractors of the department.

b. It is also the intent of the legislature that no funds appropriated under Strategy D.1.2, Family Planning, shall be distributed to individuals or entities that perform elective abortion procedures or that contract with or provide funds to individuals or entities for the performance of elective abortion procedures.

c. If the department concludes that compliance with b. would result in a significant reduction in family planning services in any public health region of the state, the department may waive b. for the affected region to the extent necessary to avoid a significant reduction in family planning services to the region. This waiver provision shall expire on August 31, 2004, and no waiver shall extend beyond that date.

d. The department shall include in its financial audit a review of the use of appropriated funds to ensure compliance with this section.

_____

[9] 78th Leg., R.S., Tex. H.B. 1.  The Governor signed the Act on June 22, 2003 and it became effective on September 1, 2003.

[10] Rider 8 applies to all TDH contractors receiving funds under Strategy D.1.2, which includes federal funds granted to TDH pursuant to Title X, Title XIX and Title XX.  The parties focus primarily on Rider 8's effect on Title X funds.

4

TDH immediately began efforts to implement Rider 8. On June 10, 2003, TDH sent letters to previously approved family planning contractors, including Appellees, requiring them to sign and return an affidavit by June 30, 2003. The affidavit was a pledge by a contractor applying for Title X and XX funds that, as of September 1, 2003, it would perform no elective abortion procedures and that it would not contract with or provide funds to individuals or entities for the performance of abortions. Appellees were informed that unless they made this pledge they would be ineligible for participation in the funding programs.

Appellees filed suit on June 26, 2003, seeking immediate injunctive relief. Appellees focused on section (b) of Rider 8 and raised three basic arguments: (1) that Rider 8(b) imposes an unconstitutional condition on Appellees' eligibility for funds; (2) that it imposes an unconstitutional burden on a woman's right to obtain an abortion; and (3) that it violates the Supremacy Clause[11] by imposing additional eligibility requirements on Appellees' receipt of federal funds that are inconsistent with the federal funding statutes.

The district court issued a temporary restraining order on June 30, 2003. A few days later, on August 4, 2003, the court entered a preliminary injunction barring TDH from enforcing

---

[11] U.S. CONST. art. VI, cl. 2.

5

paragraphs (b) and (c) of the Rider.[12] The court determined that Appellees had demonstrated a likelihood of success on the unconstitutional condition claim and the Supremacy Clause claim. In reaching this conclusion the court held that Rider 8 could not be interpreted to allow Appellees effectively to continue receiving federal funds by creating independent "affiliates"--that is, legal entities separate from those performing abortions.

TDH appeals the court's holding as to the unconstitutional condition and Supremacy Clause claims, and asserts that Rider 8 *can* be interpreted to allow affiliates. Appellees, in turn, contend that the district court erred in concluding that Rider 8 imposes no undue burden on women's right to obtain an abortion.

## II

We review the ultimate decision to grant a preliminary injunction for an abuse of discretion.[13] A decision grounded in erroneous legal principles is reviewed *de novo*.[14]

To obtain a preliminary injunction plaintiffs must show (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury if the

---

[12] *Planned Parenthood of Cent. Tex. v. Sanchez*, 280 F. Supp. 2d 590 (W.D. Tex. 2003).

[13] *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975) ("[W]hile the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance of the injunction . . . constituted an abuse of discretion."); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).

[14] *See Karaha Bodas Co.,* 335 F.3d at 363.

6

injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest.[15]  A preliminary injunction is an "extraordinary remedy" and should only be granted if the plaintiffs have "'clearly carried the burden of persuasion' on all four requirements."[16]

## III

We turn to the Supremacy Clause claim.  Appellees assert that Rider 8 is invalid under the Supremacy Clause because it adds eligibility requirements to the receipt of federal funds that are inconsistent with federal law.  The district court found a substantial likelihood of success on the merits.  In our review, we first explain why this is a preemption claim.  Then we examine whether the district court had jurisdiction and whether the Appellees stated a claim, as well as the role of 42 U.S.C. § 1983 in this case.

## A

Where, as here, a state law purportedly conflicts with federal statutes enacted under the Spending Clause,[17] courts often proceed

---

[15] *Id*.

[16] *Id.* (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

[17] U.S. CONST. art. 1, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . .").

without invoking "preemption."[18]  Some courts have explicitly found

that preemption was not an issue in such cases,[19] while others have

expressed ambivalence.[20]  The growing consensus, however, is to

analyze such claims under traditional preemption doctrine.[21]  The

First Circuit gave the following explanation:

---

[18] *See, e.g.*, *Townsend v. Swank*, 404 U.S. 282 (1971) (holding state law invalid by virtue of conflict with federal Spending Clause legislation but without reference to "preemption"); *King v. Smith*, 392 U.S. 309 (1968) (same).

[19] *See, e.g.*, *Jane Does 1 Through 4 v. State of Utah Dep't of Health*, 776 F.2d 253, 256 (10th Cir. 1985) (finding state parental consent conditions violated Title X, but noting that "[w]e do not see a preemption issue in this case").

[20] *See, e.g.*, *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 411 n.9 (1973) (noting that "pre-emption" is used "in a rather special sense" because the litigation addresses whether a state has gone too far in placing conditions on the receipt of federal funds, rather than the "arguable federal pre-emption of a wholly independent state program dealing with the same or a similar problem").
Another court expressed the following:

> It would not seem to be of any consequence whether this is described as "preemption" in the sense used in the traditional doctrine, or as an application of the Supremacy Clause to the administration of state-federal programs derived from the voluntary nature of state participation in the programs.  The latter is a more realistic treatment . . . .
>
> . . . .
>
> . . . If the [state chooses] to participate, there is thereby accepted a limitation or restriction on state statutes or regulations which conflict with the federal statutes.  This has consequences similar to the traditional preemption doctrine but as mentioned they come about by a choice made by the state.

*Planned Parenthood Ass'n of Utah v. Dandoy*, 810 F.2d 984, 988 (10th Cir. 1987) (citation omitted).

[21] *See*, *e.g.*, *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 661-68 (2003) (plurality) (addressing potential conflict between state statute and Medicaid as preemption question); *id.* at 684-85 (O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J., dissenting) (also utilizing preemption framework); *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 259 n.6, 260 (1985).

The vast majority of preemption cases involve situations in which Congress has exercised its power under the Commerce Clause. Here, however, we are dealing with a congressional exercise of the spending power, not the commerce power, and the dynamics between preemption and Congress's reliance on the spending power differ appreciably from those applicable in the Commerce Clause context. The principal difference is that whereas preemptive legislation enacted under the Commerce Clause trumps state law throughout the United States *ex proprio vigore,* preemptive legislation enacted under the spending power presents states with a choice: they may either accept federal funds (and subject themselves to requirements imposed by federal law) or decline such funds (and avoid the necessity of abiding by those requirements).[22]

Because TDH has "willingly tapped into the federal fisc,"[23] we use the terminology and framework of preemption in analyzing Appellees' Supremacy Clause claim, as did the district court below.[24]

B

We next ask whether the district court properly exercised jurisdiction over Appellees' preemption claim and whether Appellees' efforts state a claim. We answer in the affirmative.

1

---

[22] *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 42-43 (1st Cir. 1998) (citation omitted) (citing LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-29, at 508 (2d ed. 1988)); *cf. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, (2004) (upholding enforcement of consent decree as federal law against state agency, TDH, that entered into it).

[23] *O'Brien*, 162 F.3d at 43.

[24] *See Sanchez*, 280 F. Supp. 2d at 596-605.

It is well-established that the federal courts have jurisdiction under 28 U.S.C. § 1331 over a preemption claim seeking injunctive and declaratory relief.[25]  In *Shaw v. Delta Airlines*, the Supreme Court held:

> A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.[26]

We recently affirmed this principle, holding that when a plaintiff seeks "injunctive relief based on a federal statute, federal question jurisdiction clearly exists based on *Shaw*."[27]  Several of our sister circuits have explicitly agreed.[28]

2

---

[25] *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 641-43 (2002); *Lawrence County*, 469 U.S. at 259 n.6; *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

[26] *Shaw*, 463 U.S. at 96 n.14.

[27] *Gillis v. Louisiana*, 294 F.3d 755, 760 (5th Cir. 2002) (citation omitted); *see also Hope Med. Group for Women v. Edwards*, 63 F.3d 418 (5th Cir. 1995) (assuming jurisdiction exists for federal courts to adjudicate plaintiffs' claims that state abortion law conflicts with federal spending statute).

[28] *See Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1264 n.1 (10th Cir. 2004) (where preemption "is the basis for a federal claim in [plaintiff's] complaint in federal court, [*Shaw* and *Verizon*] make clear that there is federal question jurisdiction in these circumstances"); *Local Union No. 12004, United Workers of Am. v. Massachusetts*, 377 F.3d 64, 74 (1st Cir. 2004) ("[A] claim of preemption . . . *does* constitute a federal question under § 1331."); *Ill. Ass'n of Mortgage Brokers v. Office of Banks & Real Estate*, 308 F.3d 762, 765 (7th Cir. 2002) (finding that § 1331 provides jurisdiction over preemption claim); *St. Thomas-St. John's Hotel & Tourism Ass'n, Inc. v. Government of the United States Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) (same).

TDH argues that, even with federal jurisdiction over the claim, it was improper for the district court to resolve it because Appellees were not seeking to vindicate any right or to enforce any duty running to them--a necessary host, in the view of TDH, to Appellees' assertion that Rider 8 was preempted by federal Spending Clause legislation.  We disagree.

Cognizant of the distinction between the inquiry into federal court jurisdiction and whether a claim has been stated, we remind that "[i]t is firmly established [by Supreme Court precedent] that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case."[29] Recently, however, a majority of the Supreme Court in *Pharmaceutical Research and Manufacturers of America v. Walsh* implicitly rejected the contention that asserting the preemptive force of federal Spending Clause legislation is itself no claim.[30] In that case, the plaintiff alleged that a state regulation was preempted by Medicaid, a federal Spending Clause statute.  The lower court, in discussing the plaintiff's standing, observed that

---

[29] *Verizon Md., Inc.*, 535 U.S. at 642-43 (internal quotation marks and citation omitted); *see also Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 96 ("[N]onexistence of a cause of action was no proper basis for a jurisdictional dismissal."); *Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.").

[30] 538 U.S. at 661-69 (plurality); *id*. at 684-90 (O'Connor, J., dissenting).

11

the plaintiff had "not asserted an action to enforce rights under the Medicaid statute . . . but rather a preemption-based challenge under the Supremacy Clause. In this type of action, it is the interests protected by the Supremacy Clause, not by the preempting statute, that are at issue."[31] A plurality of four Justices, apparently accepting these conclusions, reached the merits of the plaintiff's claim,[32] as did the three dissenting Justices.[33] In sum, seven Justices assumed both that the federal courts have jurisdiction and that a claim was stated for Spending Clause preemption, tacitly rejecting the suggestion advanced by two concurring Justices--and today espoused by TDH--that no claim was stated.[34]

Following *Walsh*, the D.C. Circuit addressed and quickly dispensed with a defendant state agency's contention that

---

[31] *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003).

[32] *Walsh*, 538 U.S. at 661-69 (plurality) (finding state law not preempted).

[33] *Id.* at 684-90 (O'Connor, J., dissenting) (arguing that state regulation was preempted).

[34] *See Walsh*, 538 U.S. at 675 (Scalia, J., concurring) ("I would reject petitioner's statutory claim on the ground that the remedy for the States's failure to comply with the obligations it has agreed to undertake under the Medicaid Act is set forth in the act itself: termination of funding by the Secretary of the Department of Health and Human Services. Petitioner must seek enforcement of the Medicaid conditions by that authority . . . ." (citations omitted)); *id.* at 683 (Thomas, J., concurring) (expressing doubt as to "whether third parties may sue to enforce Spending Clause legislation--through pre-emption or otherwise"). These arguments have great purchase, and they might also apply in the Title X context, *see, e.g.*, 42 C.F.R. § 59.7(b); 42 C.F.R. § 59.10; 42 C.F.R. § 50.404(a)(1); however, their persuasive force is wasted on the inferior courts. Rather, they must persuade at least three other Justices.

12

plaintiffs "have no private right of action for injunctive relief against the state" based on the preemptive effect of a federal Spending Clause statute.[35] The court explained that "[b]y addressing the merits of the parties' arguments without mention of any jurisdictional flaw . . . seven Justices [in *Walsh*] appear to have *sub silentio* found no flaw."[36]

Outside the Spending Clause context, the Supreme Court has repeatedly entertained federal preemption claims seeking injunctive and declaratory relief.[37] *Shaw* itself indicates that the federal courts have jurisdiction "to *resolve*" such claims.[38] In *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, the Court recently reinforced this understanding in holding that there was jurisdiction to resolve Verizon's claim that a state utility commission's order was inconsistent with federal law.[39] The Court noted:

> Whether the text of [the federal statute] can be so construed [to provide for federal court review] is a question we need not decide. For we agree with the parties' alternative

---

[35] *Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 819 n.3 (D.C. Cir. 2004).

[36] *Id.*

[37] *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); *Shaw*, 463 U.S. at 96 n.14; *see also* David Sloss, *Constitutional Remedies for Statutory Violations*, 89 Iowa L. Rev. 355, 380 & n.141 (2004) (collecting cases).

[38] *Shaw*, 463 U.S. at 96 n.14 (emphasis added).

[39] 535 U.S. at 642.

13

> contention, that even if [the federal statute]
> does not *confer* jurisdiction, it at least does
> not *divest* the district courts of their
> authority under 28 U.S.C. § 1331 to review the
> Commission's order for compliance with federal
> law.[40]

The Court explicitly held that there was jurisdiction to entertain the preemption claim, and implicitly accepted that the plaintiffs had a right of action to bring such a claim.[41]

Our precedent likewise supports an implied right of action in this case. In *Gillis v. Louisiana*, after examining the plaintiff's petition for injunctive relief based on federal preemption and concluding that we had jurisdiction to consider it, we addressed the merits without pausing to examine the footing of the claim.[42] Similarly, in *Hope Medical Group for Women v. Edwards*, we decided the question of whether state law conflicted with federal Spending Clause legislation, again gliding by the question of whether a

---

[40] *Id.*

[41] TDH's suggestion that *Verizon* is distinguishable because "the plaintiffs identified contractual rights that were violated and therefore gave them a cause of action under the Supremacy Clause based on their existing rights" is unpersuasive. Verizon did not sue to enforce its contractual rights, and none of its claims was based on its alleged contractual rights. As the Court explained:

> Verizon alleged in its complaint that the Commission violated the Act and the FCC ruling when it ordered payment of reciprocal compensation for ISP-bound calls. Verizon sought a declaratory judgment that the Commission's order was unlawful, and an injunction prohibiting its enforcement. We have no doubt that federal courts have jurisdiction under § 1331 to entertain such a suit.

*Id.*

[42] 294 F.3d 759-60 (suit removed to federal court from state court).

14

claim had been stated.[43]  Finally, in *Self-Insurance Institute of America v. Korioth*, we confronted a claim that a Texas statutory provision was preempted by ERISA, noting that "[t]he question of preemption is particularly one for the federal courts and arises as much from the Constitution as from ERISA."[44]  In exercising jurisdiction and upholding the plaintiff's standing, we held that the non-profit organization had proffered "allegations of actual injury that are likely to be remedied with favorable court action" and remanded the case for an "inquiry into the merits."[45]  While *Gillis*, *Hope Medical* and *Korioth* do not directly address the issue of whether a valid cause of action existed, we assumed that one did.  Today we hold that one does.

Other circuits have similarly recognized an implied cause of action to bring preemption claims seeking injunctive and declaratory relief even absent an explicit statutory claim.[46]  One

---

[43] 63 F.3d at 423-38.

[44] 993 F.2d 479, 484 (5th Cir. 1993).

[45] *Id*. at 484-85.

[46] *See Local Union No. 12004*, 377 F.3d at 74-75 ("A plaintiff may assert federal preemption as an affirmative cause of action to enjoin state officials from interfering with federal rights. . . . *Verizon* and *Shaw* make clear that in suits against state officials for declaratory and injunctive relief, a plaintiff may invoke the jurisdiction of the federal courts by asserting a claim of preemption, even absent an explicit statutory cause of action."); *Thompson*, 362 F.3d at 819 n.3 (rejecting the argument that plaintiffs asserting preemption based on Spending Clause legislation have "no private right of action for injunctive relief against the state"); *Village of Westfield v. Welch's*, 170 F.3d 116, 124 n.4 (2d Cir. 1999) ("Without deciding whether Welch has a private right of action under the [federal statute], we note that Welch has asserted several federal causes of action--including claims based on the Supremacy Clause . . . --that do not depend on the existence of a private right of action under the [federal statute]."); *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir.

15

leading authority sums it up as follows:

> While there may be some lack of harmony in the
> case law, the rule that there is an implied
> right of action to enjoin state or local
> regulation that is preempted by a federal
> statutory or constitutional provision--and
> that such an action falls within the federal
> question jurisdiction--is well-established.[47]

---

1994) ("Even in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption."); *First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775, 776 n.3 (8th Cir. 1990) ("[T]he Supreme Court has . . . made clear that a party may apply directly to federal court for relief based on an affirmative claim of preemption." (citing *Lawrence County*, 469 U.S. at 259 n. 6; Shaw, 463 U.S. at 96 n.14)).

[47] RICHARD H. FALLON, DANIEL J. MELTZER, & DAVID L. SHAPIRO, HART & WECHSLER'S THE FEDERAL COURTS & THE FEDERAL SYSTEM 903 (5th ed. 2003). While the Supreme Court has not explained the source of this right of action, one school of thought holds that the Supremacy Clause itself creates an implied cause of action. Professors Wright, Miller and Cooper argue that "[t]he best explanation of *Ex Parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws." 13B CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 3566, at 102 (1984). Some courts share this view. *See, e.g.*, *Burgio & Campofelice v. N.Y. State Dep't of Labor*, 107 F.3d 1000, 1006 (2d Cir. 1997) ("[T]he Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate [federal law]."); *see also BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1289 (11th Cir. 2003) (Tjoflat, J., dissenting) (disputing majority's finding of jurisdiction but characterizing *Shaw* as "holding that plaintiffs may assert a private right of action directly under the Supremacy Clause of the Constitution"); *League of Women Voters v. Blackwell*, 340 F. Supp. 2d 823, 828 (N.D. Ohio 2004) ("[T]he Supremacy Clause provides the cause of action and federal jurisdiction."); *but see Legal Envtl. Assistance Found., Inc. v. Pegues*, 904 F.2d 640, 643 (11th Cir. 1990) (rejecting the proposition that a "constitutional cause of action should be implied directly from the Supremacy Clause"); *Mashpee Tribe v. Watt*, 542 F. Supp. 797, 806 (D. Mass. 1982) ("The Supremacy Clause does not support direct causes of action . . . . It only gives priority to federal rights created by a federal statute when they conflict with state law."), *aff'd*, 707 F.2d 23 (1st Cir. 1983). Another possible source is the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, upon which courts have occasionally explicitly relied. *See, e.g.*, *First Nat'l Bank of E. Ark.*, 907 F.2d at 776 (affirming lower court's declaration that state's action was preempted by the National Bank Act where "[j]urisdiction was invoked pursuant to 28 U.S.C. §§ 1331 and 2201"); *Doe v. Pickett*, 480 F. Supp. 1218, 1223 (S.D. W. Va. 1979) (entering judgment pursuant to §§ 2201-2202 that state cannot impose parental consent requirement on use of Title X funds). While the Declaratory Judgment Act "is not an independent ground for jurisdiction [and] permits the award of declaratory relief only when other bases for

We have little difficulty in holding that Appellees have an implied right of action to assert a preemption claim seeking injunctive and declaratory relief.

C

TDH further argues that plaintiffs must meet the requirements for an action under § 1983,[48] as recently enunciated in *Gonzaga University v. Doe*.[49]  We are not persuaded.

As an initial matter, TDH mischaracterizes the nature of Appellees' claim.  Appellees are not asking the courts to enforce their "right" under § 1983 to secure enforcement of Title X, as TDH asserts.   Rather, Appellees' Supremacy Clause argument is fundamentally different: they argue that Rider 8 imposes conditions on the receipt of federal funds that are incompatible with Title X.  Therefore, we need not be concerned that the Supremacy Clause does not of its own force create rights enforceable under § 1983.[50]

Next, we note that *Gonzaga*, by its terms, applies only to

---

jurisdiction are present," *Jones v. Alexander*, 609 F.2d 778, 781 (5th Cir. 1980) (citing, *inter alia*, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)), it might well provide a cause of action where, as here, jurisdiction is well-established.  While the district court was correct in noting that the DJA did not supply jurisdiction, it did not address the potential for the DJA to supply a right of action.  *See* Sanchez, 280 F. Supp. 2d at 602.

[48] 42 U.S.C. § 1983 (creating private cause of action against one who, "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory" causes a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws").

[49] 536 U.S. 273 (2002).

[50] *See Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 107-08 (1989).

17

§ 1983 claims.  With respect to the plaintiff's claim for damages, the Supreme Court held that "unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983."[51]  The Supremacy Clause claim advanced here by Appellees is not based on a claim of right under Title X, nor is it a claim for damages; it is a preemption claim.  The *Gonzaga* Court gave no indication that it intended to alter its prior practice regarding such claims, as we have explained.[52]

In sum, we affirm the district court's finding of jurisdiction and we hold that Appellees have an implied right of action to seek injunctive relief from a state statute purportedly preempted by federal Spending Clause legislation.  Such a claim for relief does not require a showing, as per *Gonzaga*, that a § 1983 action would also be proper.  We express no opinion on the district court's holding as to the availability of § 1983 in this case.

---

[51] *Gonzaga Univ.*, 536 U.S. at 280.

[52] *See supra* Part III.B.2; *see also Ill. Ass'n of Mortgage Brokers*, 308 F.3d at 765 (finding it unnecessary in adjudicating preemption claim to determine whether the federal statute at issue creates rights enforceable under § 1983); *cf. Concannon*, 249 F.3d at 73 (noting in discussing standing that "regardless of whether the Medicaid statute's relevant provisions were designed to benefit [the plaintiff, it] can invoke the statute's preemptive force"), *aff'd sub nom. Walsh*, 538 U.S. 644; *St. Thomas–St. John Hotel & Tourism Ass'n*, 218 F.3d at 241 (noting in discussing standing that "[w]e know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption.  On the contrary, a state or territorial law can be unenforceable as preempted by federal law *even when the federal law secures no individual substantive rights for the party arguing preemption*." (emphasis added)).

18

IV

We turn now to the merits of Appellees' preemption claim, beginning with core principles.

A

By virtue of the Supremacy Clause, it is a "fundamental principle of the Constitution . . . that Congress has the power to preempt state law."[53]  Preemption doctrine requires an examination of Congressional intent.[54]  Federal regulations have no less preemptive effect than federal statutes.[55]  State action may be preempted by federal law in three ways: "by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment."[56]  Implied conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

---

[53] *Crosby*, 530 U.S. at 372.

[54] *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152 (1982).

[55] *Id.* at 152-53.

[56] *Lorillard Tobacco Co.*, 533 U.S. at 541 (citations omitted); *accord English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (listing three categories of preemption); *AT&T Corp. v. Public Util. Comm'n of Tex.*, 373 F.3d 641, 645 (5th Cir. 2004) (same).  As the Supreme Court has hastened to point out, however, "the categories of preemption are not 'rigidly distinct.'" *Crosby*, 530 U.S. at 372 n.6 (quoting *English*, 496 U.S. at 79 n.5).

Congress."[57]

Implied conflict preemption of the obstacle variety is at issue in this case as Appellees are claiming that TDH has impermissibly added conditions and impediments to the receipt of federal funds. It is the prerogative of Congress, within limits, to attach conditions to federal funds:

> There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid.[58]

We start with "a presumption that the state statute is valid, and ask whether petitioner has shouldered the burden of overcoming that presumption."[59] The mere fact that a state program imposes an additional "modest impediment" to eligibility for federal funds

---

[57] *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (internal quotation marks omitted) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); see also *Wells Fargo Bank of Tex. NA v. James*, 321 F.3d 488, 491 n.3 (5th Cir. 2003) (explaining that implied conflict preemption occurs "where the state law mandates or places irresistible pressure on the subject of the regulation to violate federal law, where compliance with both regulations is physically impossible, where the state regulation frustrates or hectors the overall purpose of the federal scheme, or where the federal scheme expressly authorizes an activity which the state scheme disallows" (citations omitted)).

[58] *King*, 392 U.S. at 333 n.34. Congress has wide latitude to attach conditions to funds, as long as they are not "unduly coercive" or "impermissibly sweeping." *Sabri v. United States*, 124 S.Ct. 1941, 1947 (2004); *see South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

[59] *Walsh*, 538 U.S. at 661-62 (citation omitted) (citing *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944)).

20

does not provide a sufficient basis for preemption.[60]  However, a state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause.[61]  State participation in federal funding programs is voluntary, but once a state has accepted federal funds, it is bound by the strings that accompany them.[62]

B

---

[60] *Id.* at 667 (rejecting Medicaid Act preemption challenge to state statute imposing prior authorization requirement on access to prescription drugs financed by federal funds); *see also Dublino*, 413 U.S. at 422 (rejecting preemption challenge to state statute imposing employment requirements as conditions for continued eligibility for AFDC benefits).

[61] *See Blum v. Bacon,* 457 U.S. 132, 145-46 (1982) (holding provisions of New York welfare program that conflicted with federal Social Security regulations invalid under the Supremacy Clause); *Carleson v. Remillard,* 406 U.S. 598, 604 (1972) (holding California regulation that conflicted with the Social Security Act invalid under the Supremacy Clause and noting that "there is no congressional authorization for States to exclude these so-called military orphans from AFDC benefits"); *Townsend*, 404 U.S. at 286 ("[A] state eligibility standard that excludes persons eligible for assistance, under federal AFDC standards violates the Social Security Act and is therefore invalid under the Supremacy Clause."); *King*, 392 U.S. at 320 (holding Alabama statute conflicted with Social Security Act "by flatly denying AFDC assistance to otherwise eligible dependent children").
The Court summarized this line of cases as follows:

> In [*Carleson*, *Townsend*, and *King*,] it was clear that state law excluded people from AFDC benefits who the Social Security Act expressly provided would be eligible. The Court found no room either in the Act's language or legislative history to warrant the States' additional eligibility requirements. Here, by contrast, the Act allows for complementary state work incentive programs and procedures incident thereto--even if they become conditions for continued assistance. Such programs and procedures are not necessarily invalid, any more than other supplementary regulations promulgated within the *legitimate sphere* of state *administration*.

*Dublino*, 413 U.S. at 421-22 (emphasis added).

[62] *See Hope Med. Group for Women*, 63 F.3d at 421 ("Although a state's participation in the Medicaid program is voluntary, participating states must abide by the requirements imposed by Title XIX and regulations issued by the [corresponding federal agency].").

21

We first examine the question of affiliates. According to TDH, Rider 8 can be read to allow Appellees to continue to receive funds by creating separate affiliates--*e.g.* by dividing into "Family Planning" entities and "Abortion Services" entities. The district court concluded that "[s]uch a suggestion is absurd in light of the stated purpose of Rider 8--to eradicate the supposed imprimatur of state funding of abortion that currently exists-- which would be undermined if recipients could avoid Rider 8 simply by creating affiliates and making no substantive changes."[63]

However, nothing in the plain language of Rider 8 precludes the creation of affiliates. The district court's observation that "under Rider 8, funding recipients cannot provide any funds to or contract with an abortion provider" does not answer the question.[64] Rider 8 only prohibits contracting *for the performance of abortions*. It does not prohibit all contracting with an entity that performs abortions. As such, Rider 8 does not preclude a family planning services provider from maintaining a contract with TDH while simultaneously creating a separate legal entity that performs abortions and receives no federal funds.

In *Planned Parenthood of Mid-Missouri & Eastern Kansas, Inc. v. Dempsey*, the Eighth Circuit examined a Missouri state statute,

---

[63] *Sanchez*, 280 F. Supp. 2d at 611.

[64] *Id.*

similar to Rider 8, that prohibited organizations or affiliates of organizations that provided or promoted abortions from receiving state family-planning funds.[65] The court ultimately concluded that the state law was not unconstitutional, but it reached this decision only by interpreting the regulation to allow grantees to create independent affiliates that could perform abortions.[66] The court came to this conclusion despite language in the Missouri statute that, unlike Rider 8, seemed to foreclose the formation of affiliates.[67]

We have less difficulty concluding that Rider 8 admits of an interpretation that allows service providers to affiliate. Appellees' argument that Rider 8 must be read to prevent all contracting with entities that perform abortions is without merit. Accordingly, the district court's conclusion that Rider 8 prohibits affiliation is in error.

---

[65] 167 F.3d 458 (8th Cir. 1999).  The state statute at issue there restricted the Missouri Department of Health's expenditure of state funds:

> [N]one of these funds may be expended for the purpose of performing, assisting or encouraging for abortion, and further provided that none of these funds may be expended to directly or indirectly subsidize abortion services or administrative expenses, as verified by independent audit. None of these funds may be paid or granted to organizations or affiliates of organizations which provide or promote abortions. None of the funds may be expended for directly referring for abortion . . . .

89th Leg., 2d Sess., Mo. H.B. 1010, § 10.715(1), *quoted in Dempsey*, 167 F.3d at 463.

[66] *Dempsey*, 167 F.3d at 461-64.

[67] *Id.*

23

Whether Rider 8 permits the formation of separate entities and its effect if it does not permit them is the controlling question on this appeal. That is because, as we will explain, we are persuaded that, absent the possibility of affiliates, Rider 8 would likely be preempted. Under an interpretation that forecloses affiliates, Rider 8 denies participation by entities--abortion providers--that are deemed eligible by Title X and the associated regulations.[68] Rider 8's eligibility standard, by excluding entities eligible under Title X, would violate that statute and therefore be invalid under the Supremacy Clause.[69]

Appellees point to three provisions in the statute and regulations which evince a congressional intent to allow abortion providers to obtain funding. First, § 300a-6 specifies that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning."[70] This provision, Appellees contend, illustrates that Congress intended only to limit the *use* of funding, not the *identity* of recipients. Had Congress wished to bar abortion providers from receiving funding, it presumably could have included its own Rider

---

[68] Although Appellees also support their Supremacy Clause claim by reference to Title XIX and Title XX, as the instant disposition will not change, we express no opinion beyond Title X.

[69] *See Townsend*, 404 U.S. at 286.

[70] 42 U.S.C. § 300a-6.

8-style provision in Title X instead of a provision like § 300a-6.[71]

Second, Appellees point to a provision in the Department of Health and Human Services (DHHS) regulations that explicitly provides as follows:

> § 59.3 Who is eligible to apply for a family planning services grant?
>
> Any public or nonprofit private entity in a State may apply for a grant under this subpart.[72]

As Appellees stress, by its terms, this provision allows any applicant to apply for funds, even applicants who perform abortions with private funds or in separate facilities.

Finally, Appellees point to regulations adopted by DHHS on July 3, 2000, entitled the "Standards of Compliance for Abortion-Related Services in Family Planning Services Projects."[73] These standards "revise the regulations that apply to grantees under the federal family planning program" and "establish[] requirements for recipients of family planning services grants under [Title X]."[74] Overall, "[t]he effect of the revisions . . . is to revoke the compliance standards, promulgated in 1988 and popularly known as the 'Gag Rule,' that restricted family planning

---

[71] Such a provision might, of course, be unconstitutional on other grounds.

[72] 42 C.F.R. § 59.3.

[73] *See* 65 Fed. Reg. 41,270.

[74] *Id.* at 41,270 (citing 42 U.S.C. § 300).

grantees from providing abortion-related information in their grant-funded projects."[75] After discussing and rejecting the "Gag Rule," which was evaluated by the Supreme Court in *Rust v. Sullivan*,[76] the regulations carefully define how an entity can comply with the prohibition on the use of Title X funds "in programs where abortion is a method of family planning."[77] The compliance regulations state, in particular, that there need not be complete physical separation between a Title X project and private abortion activities as long as the abortion activities receive no Title X funding and the Title X activities do not promote or encourage abortion.[78] In these standards, the Secretary exhaustively considers the statute's requirements and the government's interest in ensuring that funds are not used to provide abortions and concludes that the financial audits of grant recipients are sufficient to uphold the government's interest. The Secretary's comments are clearly premised on the notion that abortion providers will receive funding. Indeed, one of the Secretary's explicit concerns is that hospitals that provide abortions not be put to needless expense by having to create

---

[75] *Id.*

[76] 500 U.S. 173 (1991).

[77] 65 Fed. Reg. at 41,270-77 (quoting 42 U.S.C. § 300a-6).

[78] *Id*. at 41,275-76.

separate facilities for family planning services.[79] The discussion makes clear that abortion providers are eligible for funding. These standards represent the interpretation of the statute by the Secretary of the DHHS, and thus are entitled to great deference.[80]

The Supreme Court's decision in *Rust* also supports Appellees' reading of the relevant congressional intent. The Court held, first, that DHHS may require physical and financial separation of abortion activities and family planning services without violating the plain language of Title X.[81] The Court explained, however, that Title X draws a distinction between Title X projects and Title X grantees:

> The Secretary's regulations do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from Title X activities. Title X expressly distinguishes between a Title X *grantee* and a Title X *project*. The grantee, which normally is a health-care organization, may receive funds from a variety of sources for a variety of purposes. The grantee receives Title X funds, however, for the specific and limited

---

[79] *Id.*

[80] *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) ("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."); *In re Cajun Elec. Power Coop., Inc.*, 109 F.3d 248, 254 (5th Cir. 1997) (finding preemption by first examining "whether the Secretary meant to pre-empt [the state agency's] rate order, and, if so, whether that action is within the scope of the Secretary's delegated authority"); *see also Thompson*, 362 F.3d at 821; *Planned Parenthood Affiliates of Mich. v. Engler*, 73 F.3d 634, 638 (6th Cir. 1996).

[81] *Rust*, 500 U.S. at 187-90.

purpose of establishing and operating a Title X project.  The regulations govern the scope of the Title X *project*'s activities, and leave the grantee unfettered in its other activities.  *The Title X grantee can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds.*[82]

The Supreme Court examined Title X and, even with the restrictive Gag Rule then in place, expressly stated that grant recipients could continue to provide abortion services outside the scope of the Title X project.  The Court concluded:

By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has . . . not denied it the right to engage in abortion-related activities. Congress has merely refused to fund such activities out of the public fisc, and the Secretary has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program.[83]

Under Title X, then, abortion providers are eligible to receive family planning funding; Title X requires only that they use that funding for legitimate Title X purposes.

TDH provides little to dispute Appellees' argument.  Its principal argument focuses on Title X's prohibition on the use of Title X funds to pay for abortions.  As the argument goes, Rider 8

---

[82] *Id.* at 196 (citations omitted) (last emphasis added).

[83] *Id.* at 198.

furthers this end by ensuring that federal funds are used correctly. TDH also points to *Rust*'s vindication of the government's power to impose regulations requiring physical and financial separation of family planning and abortion facilities. TDH insists that Rider 8 falls within *Rust*'s safe-harbor.

TDH's argument is not persuasive. While it is no doubt true that an affiliate-prohibiting Rider 8 would help ensure that funds are not misappropriated, it nonetheless would disqualify entities that Title X regards as eligible for funding without any showing that the entity has misused funds. *Rust*, moreover, provides no support for Appellees because, while *Rust* approved of regulations requiring physical and financial separation and limiting doctors' reference to abortion, those regulations were promulgated by the *federal* government.[84] Here, *Texas* is attempting to impose regulations that restrict the scope of a federal program. And Rider 8--still assuming arguendo that it does not allow for affiliates--would do far more than require physical separation; it would require that entities not engage in abortion activities even with private funds and in separate facilities. In the end, TDH

---

[84] *See Rust*, 500 U.S. at 178-81; *see also Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1997) (Congress, exercising spending power, can refuse to fund lobbying activities where organizations are free to establish a separate affiliate to engage in lobbying without the use of federal funds); *Planned Parenthood Fed'n of Am. v. Heckler*, 712 F.2d 650, 663 (D.C. Cir. 1983) ("Although Congress is free to permit the states to establish eligibility requirements for recipients of Title X funds, Congress has not delegated that power to the states. Title X does not provide, or suggest, that states are permitted to determine eligibility criteria for participants in Title X programs." (internal quotation marks and citation omitted)).

provides nothing to counter Appellees' argument that Title X--both by its express terms and as interpreted by the DHHS--allows abortion providers to receive funding.

To be entitled to a preliminary injunction, Appellees must show a substantial likelihood that they will succeed on their claim.  On an affiliate-precluding interpretation of Rider 8, the district court would not abuse its discretion in so concluding, given that Rider 8's eligibility requirements would seriously undermine and obstruct Congress's intent in distributing funds under Title X.

3

As just described, without affiliates, Rider 8 is likely doomed to preemption, so we ask if there is an alternative.  We turn to that inquiry, mindful that we "will not rewrite a . . . law to conform it to constitutional requirements."[85]  For example, in a case involving an abortion statute, the Nebraska Attorney General offered a "saving" interpretation not supported by the statute's text or legislative history, and the Supreme Court rejected the invitation, explaining that "we are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent."[86]  Where, as here, language in a statute is ambiguous and "an otherwise acceptable

---

[85] *Reno v. ACLU*, 521 U.S. 844, 884-85 (1997) (internal quotation marks and citation omitted).

[86] *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000).

construction of a statute would raise serious constitutional problems," we must "construe the statute to avoid such problems" unless such a construction would be plainly contrary to legislative intent.[87] In this case we are not merely deferring to a "convenient litigation position"[88] on the part of TDH--although it may be just that. Our own reading of Rider 8 leads us to the conclusion that affiliates are permitted.

In *Dempsey*, the court similarly sought to interpret a state statute so as to avoid running afoul of federal law.[89] In that case, the statute at issue regulated only *state* funds and, thus, did not address federal preemption issues but rather focused only on unconstitutional conditions. Nonetheless, the court's willingness to interpret the statute to allow for affiliates in order to avoid constitutional problems is instructive.[90] Similarly, we must choose the interpretation of Rider 8 that has a chance of

---

[87] *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

[88] *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

[89] 167 F.3d at 461-64.

[90] The *Dempsey* opinion is a stretch. The Missouri statute explicitly stated that "[n]one of these funds may be paid or granted to organizations *or affiliates* of organizations which provide or promote abortions." 89th Leg., 2d Sess., Mo. H.B. 1010, § 10.715(1) (emphasis added), *quoted in Dempsey*, 167 F.3d at 463. The court stated that "nothing [in this statute] expressly prohibits grantees from maintaining an affiliation with an abortion service provider, so long as the affiliated abortion service provider does not directly or indirectly receive State family-planning funds." *Dempsey*, 167 F.3d at 463. Perhaps the court concluded that the statute barred affiliates but not "independent" affiliates, but even this is less than persuasive.

avoiding federal preemption.

At this point, under the affiliate-permissible interpretation of Rider 8, there are two possibilities: either the affiliate requirement is a relatively empty formalism or it is a more substantial obstacle. The former is permissible, while the latter likely is not.

Given the district court's view that Rider 8 did not permit affiliation, the vitality of the alternative was not developed. From the limited record, we cannot say whether there is nonetheless a substantial likelihood that Rider 8 would in practical terms work the same mischief in this case as it would if it disallowed affiliation entirely. Recall that Appellees had been approved as contractors to receive federal funds when Rider 8 was enacted. Assuming that affiliation is prospectively an option for providers in general, it is not clear on this record whether Appellees had that opportunity. TDH evidenced its intent to enforce Rider 8 as to these providers when it sent them letters in early June, giving Appellees roughly twenty days to return an affidavit swearing that they would not provide abortions or contract for their provision. Given that TDH made no mention at that time of the possibility of affiliation, it is not clear that Appellees could have avoided forfeiting their contracts by affiliating, nor is it clear that there was sufficient time to do so even had they been so inclined. We note that Rider 8's effect on these previously-approved

providers might prove to be different from the impact of a purely prospective application of Rider 8 on new contract determinations.

On remand, unless Appellees can show that the burden of forming affiliates in forthcoming years would in practical terms frustrate their ability to receive federal funds, Rider 8 should be upheld and the injunction dissolved. While creating affiliates might entail some time and expense, and might not be the most convenient arrangement, this extra effort alone would not relegate the state statute to preemption.[91]

Given the disposition in this case, we need not address the district court's treatment of the remaining requirements for a preliminary injunction: threat of injury to the Appellees, to TDH, and to the public interest.

V

The case is REMANDED and the district court is directed to proceed with a trial on the merits. The injunction granted below must be dissolved unless the Appellees carry their burden of demonstrating that insisting on the use of affiliates would so hinder their operations as to work in practical terms an impermissible prohibition by the State of Texas upon the ability of these Appellees to continue their abortion services using their own

---

[91] *Cf. Dempsey*, 167 F.3d at 464 ("The Constitution does not guarantee that recipients of State funds will not be required to 'expend effort' to comply with funding restrictions." (citation omitted)); *Legal Aid Soc'y of Haw. v. Legal Servs. Corp.*, 145 F.3d 1017, 1027 (9th Cir. 1998) (White, J. (Retired), sitting by designation) ("The [*Rust*] Court did not find it constitutionally significant that the restrictions required the recipient of Title X funds to expend effort to comply with the restrictions.").

funds with no direct or indirect federal funding.

REMANDED with instructions.